28 A.3d 687

**Ronald COX**

v.

**STATE of Maryland.**

**No. 125, Sept. Term, 2010.**

Court of Appeals of Maryland.

Sept. 20, 2011.

Mark Gitomer (The Law Office of Mark Gitomer, Owings Mills, MD), on brief, for Petitioner.

Edward J. Kelley, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

On January 29, 2009, a jury in the Circuit Court for Baltimore City convicted Ronald Cox ("Petitioner"), of multi-

ple offenses relating to a murder in 2007. Cox appealed to the Court of Special Appeals, which affirmed his convictions. *Cox v. State*, 194 Md.App. 629, 5 A.3d 730 (2010). Subsequently, Cox filed for *certiorari* and we granted his petition. *Cox v. State*, 417 Md. 500, 10 A.3d 1180 (2011). In his petition Cox sought review of three questions:

I. Did the Court of Special Appeals err in upholding the admission of the hearsay testimony of State's witness Michael West, a jailhouse informant, in violation of the Petitioner's right of confrontation under the Sixth Amendment to the United States Constitution?

II. Did the Court of Special Appeals err in affirming the trial court's denial of the Petitioner's motion to suppress the Petitioner's statements allegedly made to Michael West, a jailhouse informant, at Central Booking following the Petitioner's unlawful arrest?

III. Did the Court of Special Appeals err in finding the evidence sufficient to sustain the Petitioner's convictions?

We answer all three questions in the negative.

The Court of Special Appeals held that, because the out-of-court statements to fellow inmate Michael West were made voluntarily and were unprompted in casual conversation, the statements were nontestimonial, and therefore their admission did not violate the Confrontation Clause of the United States Constitution.[1] *Cox,* 194 Md.App. at 649–50, 5 A.3d at 742. Additionally, the court held that, because the trial court found that Petitioner had adopted the statements as his own, he was effectively the declarant, and thus his availability to testify satisfied the Confrontation Clause. *Cox,* 194 Md.App. at 652, 5 A.3d at 743. The court also held that West's testimony was properly admitted because it was "sufficiently attenuated" from the "taint" of an earlier illegal search and arrest. *Cox,* 194 Md.App. at 661, 5 A.3d at 748–49. Finally, the court concluded that the evidence presented at trial, including the

---

1. The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions the accused shall enjoy the right ... to be confronted with the witnesses against him."

extrajudicial confession and the medical examiner's testimony that the manner of death was homicide, was sufficient to allow a reasonable jury to find that Petitioner was guilty beyond a reasonable doubt. *Cox*, 194 Md.App. at 663, 5 A.3d at 750.

For reasons stated in this opinion, we shall affirm the judgment of the Court of Special Appeals.

## FACTS AND PROCEDURAL HISTORY

On December 28, 2007, at approximately 12:38 p.m., Baltimore City Police Officer William Keitz found Todd Dargan lying face up, bleeding and unresponsive, at the Church Square Shopping Center in Baltimore. Officer Keitz called for a medic and surveyed the scene. He later testified that he found a bullet casing and a head wrap, or "do-rag" at the crime scene. The lead detective on the case, Baltimore City Homicide Detective David McDermott, arrived on the scene at approximately 1:00 p.m., accompanied by Detective Chester Norton. At that time, Dargan had already been transported to the hospital. Upon arrival, Detective McDermott canvassed the area and observed the head wrap and bullet casing as well.

Baltimore City crime lab technician Natalie Hoban arrived on the scene with another evidence technician, Tech Payne, at approximately 2:40 p.m. Ms. Hoban preserved the physical evidence at the scene, and identified the bullet casing observed by law enforcement to be a nine-millimeter cartridge casing. Ms. Hoban later testified at trial that, although the casing was dusted for latent fingerprints, none were found. The day after the incident, Dr. Donna Vincenti, an assistant medical examiner with the Office of the Chief Medical Examiner, conducted an autopsy of the victim's body. Dr. Vincenti determined that the victim sustained a gunshot wound to the head and the cause of death was homicide.

At approximately 12:30 p.m. on the same day the victim was shot, Baltimore City Police Detectives Milton Smith, III, Derek Phyall, and Eugene Bush were patrolling in an un-marked car approximately ten blocks away from the Church

Square Shopping Center when they observed Petitioner driving a black 2006 Mercedes Benz without his seatbelt fastened. Rodney Johnson, a black male wearing a black hooded sweatshirt, was sitting in the passenger's seat. When the car failed to come to a complete stop at a stop sign, the detectives initiated a traffic stop. Although all three detectives testified at a pretrial hearing involving Petitioner's motion to suppress, the exact time line of the events that followed, between the initial stop and Petitioner's arrest, remains unclear.

According to the findings of the Circuit Court at the suppression hearing, when the police stopped Mr. Johnson and Petitioner, Mr. Johnson's hands were visibly shaking, and Petitioner appeared calm. As the detectives spoke with Petitioner and Mr. Johnson, a series of calls came over the police radio reporting the nearby shooting, and Mr. Johnson appeared increasingly nervous as he overheard the calls. Observing this, Detective Smith asked Mr. Johnson if he possessed anything illegal, and after Mr. Johnson replied that he did not, the detective asked if he "could check." Mr. Johnson stepped out of the car and Detective Smith patted him down, but did not find either drugs or weapons in his possession. Mr. Johnson was instructed to sit on the curb beside the car.

Based on the testimony of the officers at the suppression hearing and police dispatch records, the Circuit Court found that, between fifteen and twenty-three minutes after the initial stop, a description of the suspect in the Church Square shooting was relayed over the radio describing a "black male wearing a black hoodie." Noting that Mr. Johnson matched that description, Detective Phyall asked Petitioner if there was anything in the car. In response, Petitioner stepped out of the car with his hands in the air. Detective Phyall testified that he felt this action constituted consent to a search, and while Detective Bush patted Petitioner down, finding no drugs or weapons, Detective Phyall searched the vehicle and found a handgun in the trunk. At this point, both Petitioner and Mr. Johnson were placed under arrest.

Petitioner and Mr. Johnson filed a pretrial motion to suppress the evidence obtained during the stop, namely the recovered gun. The Circuit Court held an evidentiary hearing, during which the court heard testimony from Detectives Phyall, Bush, and Smith, and subsequently granted the motion and suppressed the handgun in addition to any testimony relating to the search or arrest. The court found that the initial stop was lawful, but concluded that the length of that detention, which was between fifteen and twenty-three minutes, was unreasonable. The court based this determination on the facts that the police did not conduct a check for warrants prior to the arrest, and no citations were issued during the period between the initial detention and the call reporting the description of the murder suspect. Additionally, the hearing judge found that the police lacked both consent and probable cause to search the vehicle. *See Cox*, 194 Md.App. at 637–38, 5 A.3d at 734. The State does not challenge that the detention, and therefore the search and subsequent arrest, were unlawful.

The Circuit Court held a second pretrial suppression hearing regarding Petitioner's motion to suppress the testimony of a fellow inmate named Michael West. At the hearing, Mr. West testified that he had been arrested, on an unrelated weapons charge, on the same date as Petitioner and Johnson. According to Mr. West, he saw Petitioner and Mr. Johnson the next day in central booking. Mr. West explained that he had known Mr. Johnson for approximately fifteen years. According to Mr. West, Mr. Johnson told Mr. West about the murder and the subsequent arrest in detail, without provocation, while Petitioner stood close by, listening and occasionally filling in details. Mr. West continued that, according to Mr. Johnson, Petitioner and Mr. Johnson were driving by the shopping center when Petitioner identified the victim as someone who had been involved in the murder of an acquaintance.[2]

---

2. The court ruled, without objection from the State, that any testimony about the victim's involvement in another murder was to be suppressed as hearsay.

Mr. Johnson told Mr. West that Petitioner offered him $15,000 to kill the victim. When Mr. Johnson agreed, Petitioner gave him a nine-millimeter pistol and dropped him off on Caroline Street, adjacent to Church Square Shopping Center. Mr. Johnson ran up behind the victim and shot him in the head, then met Petitioner on Bond Street around the corner, put the gun in the trunk of the car, and got into the vehicle. According to Mr. West, Mr. Johnson then explained that they had been pulled over, and Petitioner added that the police had noticed Mr. Johnson's nervousness.

Petitioner's counsel objected to the admission of this testimony as hearsay, a violation of his right to confrontation, and as the "poisonous fruit" of the illegal detention, search, and arrest. The hearing court denied Petitioner's motion to suppress the statements, finding that, because the Petitioner made an independent decision to speak to Mr. West and did not deny the statements made by Mr. Johnson, the statements were " 'outside of the ambit of the fruit of the poisonous tree doctrine.' " *Cox*, 194 Md.App. at 638, 5 A.3d at 735. As to the hearsay issue, the hearing court held that the statements by Mr. Johnson, to Mr. West, were admissible under Md. Rule 5–803(2)[3] as adopted admissions by Petitioner, with the exception of those statements regarding events between when Mr. Johnson left Petitioner's car and when he returned, as Petitioner would not have had first-hand knowledge of those events and thus could not adopt the statements. To support its ruling, the hearing court cited to *Henry v. State*, 324 Md. 204, 596 A.2d 1024 (1991), *cert. denied*, 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992), in which we held that a party

---

**3.** Md. Rule 5–803 states, in pertinent part:

Rule 5–803. Hearsay exceptions: Unavailability of declarant not required

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(a) Statement by party-opponent. A statement that is offered against a party and is:

\* \* \*

(2) A statement of which the party has manifested an adoption or belief in its truth.

can make a "tacit admission" adopting another's statement by his or her silence.[4]

Following the pretrial motions hearings, trial commenced on January 27, 2009. Police officers Keitz, McDermott, Norton, and Phyall testified regarding the stop, arrest, and crime scene. The lab technician and medical examiner testified as to the crime scene evidence and wounds on the victim. Additionally, Michael West testified about the conversation between Mr. Johnson, himself, and Petitioner. At the pretrial suppression hearing, Mr. West testified regarding the statements made by Mr. Johnson, which were deemed tacit admissions of Petitioner. The jury convicted Petitioner of first degree murder, use of a handgun in the commission of a felony or a crime of violence, wearing, carrying or transporting a handgun, and possession of a regulated firearm after conviction of a disqualifying crime. Petitioner appealed to the Court of Special Appeals, which affirmed his convictions. *Cox v. State*, 194 Md.App. 629, 5 A.3d 730 (2010). The intermediate appellate court held that Petitioner's Sixth Amendment right to confrontation had not been violated, that Mr. Johnson and Petitioner's admission in the presence of Mr. West was sufficiently attenuated from the illegal detention and search so as to not require exclusion, and that the State produced sufficient evidence at trial to allow a reasonable jury to find Petitioner guilty beyond a reasonable doubt. *Id.*

## DISCUSSION

 As we explained recently in *Smith v. State*, 414 Md. 357, 361, 995 A.2d 685, 687–88 (2010):

---

**4.** Affirming the Circuit Court, the Court of Special Appeals held that the statements were "admitted as a tacit admission ... that the defendant has adopted as his or her own." *Cox v. State*, 194 Md.App. at 652, 5 A.3d at 743. Ultimately, we conclude that the admission of Mr. Johnson's statements satisfies the Confrontation Clause. Because Petitioner does not challenge the admissibility of Mr. Johnson's statements on the grounds that they were not properly classified as tacit admissions, we need not, and do not, evaluate the statements under relevant hearsay considerations.

We review the Circuit Court's ruling on the motion to suppress and "consider only the facts and information contained in the record of the suppression hearing." *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). "The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous." *Prioleau v. State*, 411 Md. 629, 638, 984 A.2d 851, 856 (2009) (quoting *Rush v. State*, 403 Md. 68, 82–83, 939 A.2d 689, 697 (2008)). The foregoing notwithstanding, we "undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case." *Id.* (internal citations omitted).

### A. Confrontation Clause

■ The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Similarly, Article 21 of the Maryland Declaration of Rights provides "[t]hat in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him." Because "[t]he Fourteenth Amendment renders the [Confrontation] Clause binding on the States," *Michigan v. Bryant*, 562 U.S. ——, 131 S.Ct. 1143, 1152, 179 L.Ed.2d 93, 104 (2011) (citing *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)), we analyze the admission of out-of-court statements against criminal defendants under the framework created by the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

In *Crawford*, the State obtained a tape recording of a statement that the defendant's wife had previously given to the police. She claimed marital privilege and did not take the stand to testify. *Crawford*, 541 U.S. at 38, 124 S.Ct. at 1356–57, 158 L.Ed.2d at 185. At trial, the State played the taped recording over defense objection. *Crawford*, 541 U.S. at 40, 124 S.Ct. at 1358, 158 L.Ed.2d at 186. The United States Supreme Court explained that the Confrontation Clause is

focused specifically on the defendant's right to confront "the witnesses against him," U.S. CONST. amend. VI, and the Court determined that the prevailing definition of the word "witness" at the time the Sixth Amendment was drafted was "those who 'bear testimony.'" *Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192 (citing 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LAN-GUAGE (1828)). As a result, the Court held that:

> An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192–93.

The Court continued that, regardless of the prevailing hearsay laws or how reliable a statement may be, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 53–54, 124 S.Ct. at 1365, 158 L.Ed.2d at 194. In contrast, the Court explained that if a statement is nontestimonial, the Confrontation Clause does not bar its admission, and the only remaining question is whether the statement is admissible under the relevant rules of evidence. *Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203 (stating that "an approach that exempted such [nontestimonial] statements from Confrontation Clause scrutiny altogether" would be "wholly consistent with the Framers' design").

Thus, following *Crawford,* whether a statement was considered "testimonial" became critically important to the Confrontation Clause analysis. The Court explained:

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custo-

dial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," ... "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," ... "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Crawford*, 541 U.S. at 51–52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193 (citations and quotations omitted). Although the Court found that the term testimonial "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," it left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.

Later, *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), expanded on the *Crawford* principle, creating the following test for determining whether an out-of-court statement given during police interrogation is testimonial:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822, 126 S.Ct. at 2273–74, 165 L.Ed.2d at 237. In *Davis*, the defendant was accused of domestic violence against his former girlfriend. The trial court allowed the State to play a tape recording of a 911 call the victim made, seeking help during a physical altercation with Davis. *Davis*, 547 U.S. at 817, 126 S.Ct. at 2271, 165 L.Ed.2d at 234.

The Court concluded that, under the above test, the recording was admissible despite the fact that the victim did not testify, because the statements "were not testimonial." *Davis,* 547 U.S. at 829, 126 S.Ct. at 2277, 165 L.Ed.2d at 241. The Court explained that the victim's "call was plainly a call for help resulting from a bona fide physical threat.... [T]he nature of what was asked and answered in *Davis,* again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *Davis,* 547 U.S. at 827, 126 S.Ct. at 2276, 165 L.Ed.2d at 240.

Although the facts of *Davis* "[made] it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial,'" *Davis,* 547 U.S. at 823 n. 2, 126 S.Ct. at 2274, 165 L.Ed.2d at 238, the Court strongly implied that statements made in casual conversation between prisoners are nontestimonial. While other courts did not necessarily use the term "testimonial" or explicitly refer to the distinction between testimonial and nontestimonial statements until *Crawford* in 2004, the Court in *Davis* pointed out that courts have consistently found that the right to confrontation "applied only in the testimonial context" throughout American history. *Davis,* 547 U.S. at 824, 126 S.Ct. at 2275, 165 L.Ed.2d at 238. The Court continued that "[w]here our cases did dispense with those [Confrontation Clause] requirements ... the statements at issue were clearly nontestimonial." *Davis,* 547 U.S. at 825, 126 S.Ct. at 2275, 165 L.Ed.2d at 239. To illustrate this point, the Court cited *Bourjaily v. United States,* 483 U.S. 171, 181– 84, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (finding no Confrontation Clause violation in admission of statements made by a co-conspirator to an undercover informant) and *Dutton v. Evans,* 400 U.S. 74, 87–89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality opinion) (finding no violation in the admission of a statement made by a co-conspirator to another inmate). *Davis,* 547 U.S. at 825, 126 S.Ct. at 2275, 165 L.Ed.2d at 239.

Although the pre-*Crawford* reasoning employed in *Dutton* is no longer valid, the facts of *Dutton* are quite similar to those

in the present case and the Supreme Court's subsequent treatment of those facts in its post-*Crawford* Confrontation Clause cases aids in our analysis. As a result, it is significant that the *Davis* Court referred to the *Dutton* statements as "clearly nontestimonial." *Id.* In *Dutton,* the defendant, Alex Evans, was convicted of first degree murder for the fatal shooting of three policemen. *Dutton,* 400 U.S. at 76, 91 S.Ct. at 213, 27 L.Ed.2d at 219. At his trial, the prosecution was allowed to introduce testimony by an inmate named Shaw, regarding a statement made by Evans's co-conspirator, a man named Williams, when Shaw and Williams were sharing a jail cell. According to the Court, "Shaw said that when Williams was returned to the penitentiary from the arraignment, he had asked Williams: 'How did you make out in court?' and that Williams had responded, 'If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now.' " *Dutton,* 400 U.S. at 77, 91 S.Ct. at 214, 27 L.Ed.2d at 220.

As in the present case, in *Dutton,* it did not appear that the witness was acting as a law enforcement agent at the time the incriminating statements by the co-conspirator were made. *See Dutton,* 400 U.S. at 87, 91 S.Ct. at 219, 27 L.Ed.2d at 226 (stating that the case "does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation"). Like the jailhouse informant in this case, it was purely coincidental that Shaw was in the same jail at the same time as Williams. Further, similar to Mr. Johnson's statements to Michael West in the present case, Williams's statements in *Dutton* arose purely out of casual conversation.

Additionally, several courts since *Crawford* have held that statements made by one inmate to another are nontestimonial, even where the testifying witness was acting as a government agent. *See, e.g., United States v. Smalls,* 605 F.3d 765, 779–80 (10th Cir.2010) (involving a statement to an inmate acting as confidential informant was "undoubtedly nontestimonial under any legitimate view of the law" because the defendant "did not make his statement to [the] CI for the 'primary purpose' of establishing or proving facts relevant to a later prosecution" and the statement lacked the formality required to render a

statement testimonial); *United States v. Johnson,* 495 F.3d 951, 976 (8th Cir.2007) (determining that remarks by one inmate to another "fall safely outside the scope of testimonial hearsay" because "Honken was not making 'formal statements.' Nor were his statements elicited in response to government interrogation whose primary purpose was to establish facts potentially relevant to a criminal prosecution."). Specifically, we find the analysis in *Smalls* particularly enlightening. In applying the primary purpose test from *Davis,* the 10th Circuit explained,

> Moreover, Cook did not make his statement to [the] CI for the 'primary purpose' of establishing or proving facts relevant to a criminal prosecution. Obviously, Cook would not have shared what he did had he known the Government was recording his statement or that his cellmate was a CI. Objectively viewed from Cook's standpoint, his statement was much more akin to casual remarks to an acquaintance than formal declarations to an official. Cook in no sense intended to bear testimony against Defendant Smalls; Cook in no manner sought to establish facts for use in a criminal investigation or prosecution. Cook boasted of the details of a cold-blooded murder in response to 'casual questioning' by a fellow inmate and apparent friend. Cook's statement is undoubtedly nontestimonial under any legitimate view of the law.

*Smalls,* 605 F.3d at 779–80 (internal citations omitted).

In a post-*Crawford* Confrontation Clause case decided by the United States Supreme Court, *Giles v. California,* 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), the Court held that a California statute providing a "forfeiture by wrongdoing" exception to the right of confrontation was too broad. *Giles,* 554 U.S. at 359–60, 128 S.Ct. at 2683–84, 171 L.Ed.2d at 495–96. Responding to the dissent's criticism in *Giles* that this holding would create particular hardships in domestic violence cases, Justice Scalia explained for the Court that "only *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of

receiving treatment would be excluded, if at all, only by hearsay rules." *Giles*, 554 U.S. at 376, 128 S.Ct. at 2692–93, 171 L.Ed.2d at 505–06.

The Court's declaration in *Davis* that the casual remarks in *Bourjaily* and *Dutton* were "clearly nontestimonial," *Davis*, 547 U.S. at 825, 126 S.Ct. at 2275, 165 L.Ed.2d at 239, the assertion in *Giles* that statements to "friends and neighbors" or to "physicians" are not testimonial, *Giles*, 554 U.S. at 376, 128 S.Ct. at 2692–93, 171 L.Ed.2d at 505–06, and the underlying premise in *Crawford* that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not," *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192, strongly suggest that most, if not all, statements that are not made to state actors are nontestimonial.

Earlier this year, in *Michigan v. Bryant*, 562 U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the United States Supreme Court elaborated on its earlier holdings and provided a broader framework for determining whether a statement is testimonial. In *Bryant*, a murder victim made statements to police officers, who found the victim dying in a parking lot, identifying the defendant as his killer. *Bryant*, 562 U.S. at ——, 131 S.Ct. at 1150, 179 L.Ed.2d at 102. The Court held that the statements were nontestimonial because "the circumstances of the interaction between [the victim] and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.' " *Bryant*, 562 U.S. at ——, 131 S.Ct. at 1150, 179 L.Ed.2d at 101 (quoting *Davis*, 547 U.S. at 822, 126 S.Ct. at 2273). The Court explained that "[w]hen, as in *Davis*, the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause." *Bryant*, 562 U.S. at ——, 131 S.Ct. at 1155, 179 L.Ed.2d at 107. Thus, if the primary purpose of a statement is not to create a substitute for trial testimony, then "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confronta-

tion Clause." *Bryant*, 562 U.S. at ——, 131 S.Ct. at 1155, 179 L.Ed.2d at 107–08. In making this determination, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 562 U.S. at ——, 131 S.Ct. at 1156, 179 L.Ed.2d at 108–09.

■ Applying the holdings in *Crawford*, *Davis*, and *Bryant* to this case, the Court of Special Appeals held that Mr. Johnson's statements were nontestimonial because "they were not made under circumstances in which a reasonable person would believe that the statements would be available for use at a later trial." *Cox v. State*, 194 Md.App. 629, 649, 5 A.3d 730, 741 (2010). Petitioner argues that none of these cases applied to statements made outside the contexts of law enforcement investigations or judicial proceedings, and that whether a conversation between private citizens should be considered testimonial is an "open question." Petitioner also contends that the Court of Special Appeals "was led astray" by extrapolating general principles from the Supreme Court's holdings in cases in which the statements in question were given to police officers. According to Petitioner, the Clause's protections might extend to purely private interactions, noting that Justice Scalia, in his dissent in *Bryant*, referenced *King v. Brasier*, 1 Leach 199, 200, 168 Eng. Rep. 202, 202–03 (K.B. 1779), in which an English court refused to admit a mother's account of statements her daughter made after being sexually assaulted. *Bryant*, 562 U.S. at ——, 131 S.Ct. at 1173, 179 L.Ed.2d at 126 (Scalia, J., dissenting).

In contrast, the State argues that the Court of Special Appeals was correct to apply the objective primary purpose test laid out in *Bryant*. The State relies on *Davis*, *Crawford*, *Bryant*, and cites to *State v. Snowden*, 385 Md. 64, 83, 867 A.2d 314, 325 (2005), in which we held that a statement given during police interrogation is testimonial if "made under circumstances that would lead an objective declarant reasonably

to believe that the statement would be available for use at a later trial." Citing to these cases, the State argues that "the intermediate appellate court properly applied the very factors enunciated by both the Supreme Court and this Court ... because application of the prevailing factors compels the conclusion that Cox's statements to West were not testimonial, they were not inadmissible under *Crawford.*"

We agree with the State that the Court of Special Appeals applied the correct test. We hold that when the State seeks to introduce an out-of-court statement against a criminal defendant, the proper inquiry under *Crawford* and *Bryant* is to determine whether a reasonable person in the declarant's situation would have made the statement "with a primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at ——, 131 S.Ct. at 1155, 179 L.Ed.2d at 107. Thus, if the primary purpose of the statement is "made under circumstances that would [not] lead an objective declarant reasonably to believe that the statement would be available for use at a later trial," *Snowden*, 385 Md. at 83, 867 A.2d at 325, then it is not testimonial and the Confrontation Clause does not bar its admission.

Applying this test to the facts of this case, Mr. West testified that the conversation with Mr. Johnson and the Petitioner began because Mr. West and Mr. Johnson had known each other for approximately fifteen years. Mr. West was not acting as a law enforcement agent; rather, the interaction was a casual conversation between private acquaintances. Further, much like in *Smalls*, it is unlikely that Mr. Johnson would have made the statements to Mr. West if he believed the statements would be used in a later trial. Rather, the statements were "much more akin to casual remarks to an acquaintance than formal declarations to an official." *Smalls*, 605 F.3d at 780 (referencing *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354). In our view, Mr. Johnson did not intend to bear testimony against Cox, nor did he seek to establish "facts for use in a criminal investigation or prosecution." *Id.* Like the casual conversation between cell mates in *Dutton,* which

the Supreme Court referred to as "clearly nontestimonial" in *Davis*, 547 U.S. at 825, 126 S.Ct. at 2275, 165 L.Ed.2d at 239, Mr. Johnson's statements were "spontaneous, and it was against his penal interest to make [them]." *Dutton*, 400 U.S. at 89, 91 S.Ct. at 220, 27 L.Ed.2d at 227. Therefore, the casual statements between acquaintances were not made for the primary purpose of creating a substitute for trial testimony.

## B. Fruit of the Poisonous Tree

■■■■ Petitioner argues that Mr. West's testimony should have been suppressed as the "poisonous fruit" of the illegal search, because Petitioner and Mr. Johnson were only in jail, and thus in a position to make their admissions to Mr. West, because the police illegally detained them and searched their car. "[T]he fruit of the poisonous tree doctrine excludes direct and indirect evidence that is a product of police conduct in violation of the Fourth Amendment." *Myers v. State*, 395 Md. 261, 291, 909 A.2d 1048, 1066 (2006). Though the phrase "fruit of the poisonous tree" and the attending doctrine date as far back as the United States Supreme Court's decision in *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939), we are generally guided by the Court's seminal decision in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Wong Sun*, the Court explained that, although evidence derived from illegal police activity is generally inadmissible, some derivative evidence can be introduced. In determining what evidence will be admissible, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come [sic] at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455 (quoting MAGUIRE, EVIDENCE OF GUILT, 221 (1959)). The burden is on the defendant to show the evidence should be suppressed. Specifically,

> [a] defendant seeking shelter under the umbrella of the 'fruit of the poisonous tree' doctrine has to prove each of

two propositions: 1) the primary illegality, to wit, that the tree was poisonous; and 2) the cause and effect relationship between the primary illegality and the evidence in issue, to wit, that the evidence was, indeed, the identifiable fruit of that particular tree.

*Gibson v. State*, 138 Md.App. 399, 404, 771 A.2d 536, 539 (2001). The Court of Special Appeals has pointed out, however, that evidence is not excluded "merely because it would not have been discovered 'but for the illegal actions of the police.' " *Cox*, 194 Md.App. 629, 655, 5 A.3d 730, 745 (2010) (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417). Rather, there are three ways to "purge the taint" of the illegality. *Miles v. State*, 365 Md. 488, 520–21, 781 A.2d 787, 806 (2001). We explained the three methods in *Miles v. State:*

> First, evidence obtained after initial unlawful governmental activity will be purged of its taint if it was inevitable that the police would have discovered the evidence. *See Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984). Second, the taint will be purged upon a showing that the evidence was derived from an independent source. *See United States v. Wade*, 388 U.S. 218, 239–242, 87 S.Ct. 1926, 1938–1940, 18 L.Ed.2d 1149, 1164–1166 (1967). The third exception ... will allow the use of evidence where it can be shown that the so-called poison of the unlawful governmental conduct is so attenuated from the evidence as to purge any taint resulting from said conduct. *See Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455.

*Miles*, 365 Md. at 520–21, 781 A.2d at 806.

In the present case, the State relies on the third exception, the attenuation doctrine, to argue that Mr. West's testimony has been "purged" of the "taint" of the illegal search and arrest. We described the attenuation analysis in *Miles:* "[A]n analysis of attenuation also requires consideration of the following factors: 1) the proximity between the actual illegality and the evidence sought to be suppressed; 2) the presence of intervening factors; and 3) the flagrancy of the governmental

misconduct involved in the case." *Miles*, 365 Md. at 522, 781 A.2d at 806 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416, 427 (1975)). We have also explained that the analysis involves a balancing test, and "no single factor is dispositive on the issue of attenuation." *Cox v. State*, 397 Md. 200, 219, 916 A.2d 311, 322 (2007) (citing *Ferguson v. State*, 301 Md. 542, 553, 483 A.2d 1255, 1260 (1984)).

The first factor to be considered under the *Miles* attenuation analysis is the "proximity between the actual illegality and the evidence." There is no "mathematically precise test" to determine how much time must pass in order to purge the taint. *Miles*, 365 Md. at 527, 781 A.2d at 810 (quoting *Ferguson*, 301 Md. at 550, 483 A.2d at 1259). In *Brown*, the United States Supreme Court held that a confession made two hours after an illegal arrest had not been purged of the taint of the primary illegality. *Brown*, 422 U.S. at 604–05, 95 S.Ct. at 2262; *see also Taylor v. Alabama*, 457 U.S. 687, 691, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982) (finding six hours insufficient to purge the primary taint); *Dunaway v. New York*, 442 U.S. 200, 218–19, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979) (finding two hours insufficient). Further, in *Ferguson v. State*, we held that an identification made 20 minutes after an illegal arrest was insufficient as well. *Ferguson*, 301 Md. at 550, 483 A.2d at 1259.

In contrast, while the passage of minutes or hours may weigh against a finding of attenuation, other courts have found that a lapse of time approaching one day weighs in favor of a finding of attenuation. The State argues that, in the present case, sufficient time passed between the primary illegality and the evidence sought to be suppressed to purge the taint of the illegal action. For this proposition, the State cites *State v. Blackman*, 246 Conn. 547, 716 A.2d 101, 106 (1998) (statements made 14 hours after stop "lacked temporal proximity to the allegedly illegal police action"), *State v. Serrato*, 424 So.2d 214, 218 (La.1982) (challenging a confession made 21 hours after illegal arrest was "fairly distant"), and *State v. Belton*,

654

150 N.H. 741, 846 A.2d 526, 533 (2004), *cert. denied,* 543 U.S. 1028, 125 S.Ct. 674, 160 L.Ed.2d 509 (2004) (noting the passage of 24 hours was a "significant period of time which reduces the possibility that the defendant's statements were the product of the illegal detention as opposed to his own free will").

In this case, Petitioner and Mr. Johnson's statements were made approximately 20 hours after Petitioner's illegal arrest. Although certainly not dispositive, we agree with the State and the Court of Special Appeals that this amount of time provides sufficient separation between the illegal activity and the challenged statements to weigh in favor of a finding of attenuation. We stress, however, that, "[b]ecause a lengthy detention can be used to exploit an illegal arrest at least as easily as a brief detention, the temporal proximity factor has been labeled 'ambiguous,' and 'relatively unimportant,' " and therefore our attenuation analysis does not end here. *Ferguson v. State,* 301 Md. at 550, 483 A.2d at 1259 (citations omitted).

The second *Brown* factor is the presence of intervening circumstances. An intervening circumstance is any event that "breaks the causal connection between the unlawful conduct and the derivative evidence." *Myers,* 395 Md. at 288, 909 A.2d at 1064 (quoting *Ferguson,* 301 Md. at 551, 483 A.2d at 1259). When conducting this analysis, "the focus should more appropriately be on the accused to determine whether there was any event that contributed to his ability to consider carefully and objectively his options and to exercise his free will." *Ferguson,* 301 Md. at 551, 483 A.2d at 1259 (citing *Taylor,* 457 U.S. at 691, 102 S.Ct. at 2668, 73 L.Ed.2d at 320). Thus, we consider "the voluntariness of a person's actions . . . as an intervening factor. . . ." *Miles,* 365 Md. at 525, 781 A.2d at 808.

Although neither this Court nor the Supreme Court have ruled on this particular set of facts, the State points out that other jurisdictions have held that the voluntariness of a statement made to another inmate while the defendant was illegally

detained is sufficient to support a finding of attenuation. *See State v. Ostroski,* 201 Conn. 534, 518 A.2d 915, 923 (1986) (holding that the inmate "was not an agent of the police" and that, balancing all three *Brown* factors, the defendant's confession to a fellow inmate "was not the product of police exploitation of any prior illegality but was a totally unexpected voluntary admission by the defendant"); *see also United States v. Houle,* 620 F.2d 164, 165–66 (8th Cir.1980) (holding that statements the defendant made to his cellmates two hours after his illegal arrest were admissible because they "were not prompted by coercion or interrogation and were voluntarily made under [the defendant's] control").

In this case, Mr. West's testimony at the hearing suggests that he was unaware of the murder before Mr. Johnson made his statements, and that Mr. Johnson and Petitioner were not responding to questioning by Mr. West. In response to questions by Petitioner's counsel, Mr. West testified that "when [Johnson] first told me about it I couldn't believe who had got, who had killed [sic]." The fact that Mr. Johnson's statements, and Petitioner's acceptance thereof, were purely voluntary, unprompted by police interrogation or action, or any interrogation at all, is an intervening circumstance which weighs heavily in favor of allowing the evidence to be admitted.

The third and final *Brown* factor is the purposefulness of the police misconduct. This factor cuts to the heart of the purpose behind the exclusionary rule: to "provide[ ] an incentive for police to engage in lawful conduct." *Ferguson,* 301 Md. at 552, 483 A.2d at 1260. As a result, police misconduct with "a quality of purposefulness," *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262, will weigh in favor of exclusion of the resulting evidence. Petitioner argues that Mr. West's presence to hear the confession combined with Mr. West later reporting the confession to the police "seem[ed] more than simply coincidental," and therefore created "a reasonable inference that West was working as an informant for the police." The Court of Special Appeals held that "this claim is unpre-

served." *Cox v. State,* 194 Md.App. 629, 660 n. 16, 5 A.3d 730, 748 (2010).[5]

Nevertheless, we .point out that the hearing court in this case specifically found as a fact that "Michael West [was] not a law enforcement officer and that this was not a statement given in any way that could be characterized to a law enforcement [sic] since he's nothing but a citizen himself detained at the central booking facility." We are persuaded, however, by the reasoning of the court in *Ostroski,* 518 A.2d at 923, where the Supreme Court of Connecticut determined that

> the defendant's voluntary conduct in admitting the killing to his friend was not the product of police exploitation of any prior illegality but was a totally unexpected voluntary admission by the defendant.

Neither the police conduct surrounding the illegal detention, search, and arrest, nor the circumstances which led to Petitioner and Mr. Johnson's admissions in the presence of Mr. West were flagrant or purposeful. Thus, all three factors in the attenuation analysis weigh in favor of admitting the evidence. There was significant time between the initial taint and when the statements were made, the voluntariness of Mr. Johnson's statements constituted an intervening factor, and there does not appear to be any indication that Mr. West was serving as an inserted informant. Therefore, we shall hold that the trial court did not err in denying Petitioner's motion to suppress.

### C. Sufficiency of the Evidence

This Court reviews a question regarding the sufficiency of the evidence in a jury trial by asking "whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

---

5. In his petition for writ of certiorari filed in this case, Petitioner does not challenge the intermediate appellate court's holding with respect to preservation. Therefore, the question is not properly before this Court. *See Gonzales v. State,* 322 Md. 62, 69, 585 A.2d 222, 226 (1991) (noting that an issue not in the petition for writ of certiorari or in an order granting the writ is "not before us, and we need not address it").

elements of the crime beyond a reasonable doubt.'" *Allen v. State,* 402 Md. 59, 71, 935 A.2d 421, 428 (2007) (quoting *Rivers v. State,* 393 Md. 569, 580, 903 A.2d 908, 915 (2006)). We "must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference." *Bible v. State,* 411 Md. 138, 156, 982 A.2d 348, 358 (2009) (quoting *State v. Suddith,* 379 Md. 425, 430, 842 A.2d 716, 719 (2004)).

"[I]t is, of course, well settled that an extrajudicial confession of guilt by a person accused of crime, unsupported by other evidence, is not sufficient to warrant a conviction." *Woods v. State,* 315 Md. 591, 615, 556 A.2d 236, 248 (1989) (quoting *Bradbury v. State,* 233 Md. 421, 424, 197 A.2d 126 (1964)). Rather, "the extrajudicial confession must be supported by evidence, independent of the confession, which relates to and tends to establish the *corpus delicti, i.e.,* the facts that are necessary to show that a crime has been committed." *Woods,* 315 Md. at 615–16, 556 A.2d at 248 (quoting *Bradbury,* 233 Md. at 424, 197 A.2d at 126). But "it is not necessary that the evidence independent of the confession be full and complete or that it establish the truth of the *corpus delicti* beyond a reasonable doubt or by a preponderance of proof." *Woods,* 315 Md. at 616, 556 A.2d at 248 (quoting *Cooper v. State,* 220 Md. 183, 190, 152 A.2d 120 (1959)). Rather, "[t]he supporting evidence . . . 'may be small in amount' and is sufficient to establish the *corpus delicti* 'if, when considered in connection with the confession or admission, it satisfies the trier of facts beyond a reasonable doubt that the offense charged was committed and that the accused committed it.'" *Miller v. State,* 380 Md. 1, 46, 843 A.2d 803, 829 (2004) (quoting *Bradbury,* 233 Md. at 424–25, 197 A.2d at 128; *Woods,* 315 Md. at 616, 556 A.2d at 248).

In a murder case, "'the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone.'" *Woods,* 315 Md. at 617, 556

A.2d at 249 (citing *Jones v. State,* 188 Md. 263, 272, 52 A.2d 484 (1947)). Petitioner does not dispute these standards, but argues that "[o]ther than Michael West's testimony, there was nothing to establish the Petitioner's participation in the crimes charged." As we held in *Ballard,* however, the *corpus delecti* need not connect the defendant to the act. *Ballard v. State,* 333 Md. 567, 578, 636 A.2d 474 (1994) (explaining that when the charged crime is homicide, "the *corpus delecti* consists of proof that the victim died and that the death was caused by a criminal act, but it need not tend to connect the defendant on trial with that act"). Further, in *Woods,* we found that the defendant's statements confessing to the murder of Michael Boyd were sufficiently corroborated by a medical examiner's testimony that the victim was dead and that the cause of death was gunshot wounds. We explained that:

> The gunshot wounds were enough to show that the manner of death was homicide—that Boyd's death was not by accident or suicide but was caused criminally by someone. With this corroboration the confession was enough to meet the test for the sufficiency of the evidence to sustain the conviction of murder in the first degree.

*Woods,* 315 Md. at 617, 556 A.2d at 249.

In the present case, Dr. Vincenti, an assistant medical examiner, testified that she performed an autopsy on the body of Todd Dargan, that Mr. Dargan was dead, and that the cause of death was a gunshot wound to the head. Although this is sufficient corroboration to support Petitioner's conviction for murder, the State, however, provided additional direct corroboration of Mr. West's testimony. Both Officer Keitz and Detective McDermott testified to finding a bullet casing at the scene of the murder and Natalie Hoban, the crime lab technician, testified that it came from a nine-millimeter round. This corroborated Mr. West's testimony that Petitioner and Mr. Johnson told him that Petitioner had given Mr. Johnson a "nine" to use in the murder. Additionally, Detective Phyall testified about conducting a traffic stop of Petitioner's vehicle, putting Petitioner and Mr. Johnson within 12 blocks of the scene of the murder, within an hour of its occurrence. Detec-

tive Phyall also testified that Mr. Johnson was wearing a black hooded sweatshirt and that he "was shaking uncontrollably." This again corroborated Mr. West's testimony that Mr. Johnson told Mr. West that he was wearing a black hooded sweatshirt and that Petitioner said that the police, when conducting the traffic stop, noticed that Mr. Johnson was nervous. This additional corroboration, combined with Mr. West's and Dr. Vincenti's testimony, was sufficient to support all of Petitioner's convictions.

**THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. PETITIONER TO PAY THE COSTS.**