73 A.3d 1108

**Orville COOPER**

v.

**STATE of Maryland.**

**No. 37, Sept. Term, 2012.**

Court of Appeals of Maryland.

Aug. 26, 2013.

Peter F. Rose, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and BELL,* JJ.

GREENE, J.

On April 28, 2010, a jury in the Circuit Court for Baltimore City convicted Orville Cooper ("Cooper") of second degree rape and multiple counts of second, third, and fourth degree

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

sexual offenses and one count of second degree assault. After filing a motion for a new trial, Cooper filed a timely appeal to the Court of Special Appeals, and prior to the intermediate appellate court rendering a decision, we granted *certiorari* on our own motion, 427 Md. 606, 50 A.3d 605 (2012), to address questions raised by Cooper:

1.  Whether the trial court erred in allowing a DNA [deoxyribonucleic acid] analyst to testify regarding the analysis of another DNA analyst, who did not testify at trial, and/or erred in admitting that non-testifying analyst's report into evidence: a) without a proper foundation in the form of a demonstrated chain of custody of the evidence tested; b) in violation of the rules against the admission of hearsay; and/or c) in violation of appellant's federal and/or State constitutional right of confrontation.

2.  Whether the trial court erred in admitting other prejudicial hearsay.

We affirm Cooper's conviction, concluding that: (1) the State met its burden of showing chain of custody of a napkin, from which DNA was found connecting Cooper to the victim; (2) admitting the report of the analyst who performed the DNA tests on biological material found on the napkin did not violate the rule against hearsay; (3) admitting the report also did not violate Cooper's right to confront adverse witnesses under either the Sixth Amendment to the federal Constitution or Article 21 of the Maryland Declaration of Rights; and (4) the trial judge did not commit error when he admitted the hearsay statements of the victim through the testimonies of the victim's roommate and the investigating officer as excited utterances.

## FACTUAL BACKGROUND

Orville Cooper was charged with multiple counts of rape, sexual offenses, assault, robbery, and other crimes. Cooper's charges related to a February 16, 2006 attack on a woman in Baltimore City. A significant aspect of the prosecution's case-in-chief was that a match was found between Cooper's DNA

and the DNA found in the biological material on a napkin into which the victim testified she spit her attacker's semen. Although much of the scientific testing of the evidence was conducted by Baltimore City Police Department's own laboratory (the "BPD lab"), the Baltimore City Police Department sent the napkin, along with other physical evidence, to a private laboratory, the Bode Technology Group ("Bode"), where an analyst, Sarah Shields, derived DNA profiles from the biological materials on the different pieces of physical evidence, including the napkin. As noted below, at trial the State introduced testimony that the DNA profile developed from material on the napkin was "consistent with" Cooper's DNA profile.

We now turn to the trial court proceedings. The victim of the sexual assault ("Victim") testified in-court to the following:

On February 16, 2006, at approximately four o'clock in the morning, Victim was waiting at a bus stop in Baltimore City to begin her trip to Fort Meade, where she worked as a cook, when a car approached her and the driver offered her a ride as a "hack" taxi.[1] After she got into the back seat of the car, the driver ("Driver") pulled Victim into the front seat, threatened her with a box-cutter, undressed her, and sexually assaulted her. Driver forced Victim to perform oral sex upon him and anally and vaginally raped her. Driver wore a condom during the sexual acts, but he removed the condom at one point during oral sex and ejaculated into Victim's mouth. She spit the ejaculate into a napkin (the "napkin").[2] After Victim spit into the napkin, she kept the napkin because she had no witnesses and she wanted "something tangible of his"

---

1.  " 'Hacking' is a colloquial term used to describe the provision of taxi services without a license. Article 19, § 52–2 of the Baltimore City Code (2012) prohibits hacking under the section titled 'Providing taxi services without license[.]' " *McCracken v. State*, 429 Md. 507, 511 n. 1, 56 A.3d 242, 244 n. 1 (2012).

2.  As indicted below, the DNA from biological material on the napkin was connected to Cooper, implicating him, so we focus primarily on the facts relating to the custody and testing of the napkin.

as proof.[3]    Additionally, Driver stole money from Victim. After the attack, Driver pushed Victim out of the car and Victim walked to her home, where, upon yelling for help, her roommate ("Roommate") called the police.  Victim was taken to a hospital, where she met with a detective from the Sexual Assault Unit, Detective Grubb.  Victim was examined by a medical professional and she gave the napkin to the police.[4] Approximately one year later, in April 2007, detectives located Victim and showed her a photo array from which she identified Cooper's picture as that of her assailant.  Victim additionally identified Cooper in open court.

The State also called Roommate as a witness.  Roommate testified that he remembered being awaken by "a frantic [Victim] coming into the home" after she "came in very hysterical."  Roommate further testified that, after Victim told him she had been raped, he went to a pay phone to call the police.  Then, over an objection that it was hearsay, Roommate testified as to what Victim had told him about some of the details of the rape.

Detective Danny Grubb ("Grubb") of the Baltimore City Police Department also testified during the State's case-in-chief.  Grubb testified that his involvement with this case began when the "primary officer," Officer Jason Monn ("Monn"), notified Grubb that Monn was with a rape victim and "needed assistance with the investigation."  After instructing Monn to transport Victim to the hospital, Grubb met her there.  Detective Grubb also testified that, among other things:  he interviewed Victim; he "authorized" a Sexual Assault Forensic Exam, or a SAFE exam, of Victim, which is done "[t]o collect forensic evidence that ... may have been

---

**3.**  Throughout the trial the napkin was referred to as a "tissue," "napkin" and a "Kleenex."  For consistency and clarity, we shall refer to the item as the "napkin" throughout this discussion.

**4.**  According to the record she gave the napkin to Daniel Sheridan, the nurse who examined her as part of the Sexual Assault Forensic Exam, or SAFE exam.  Sheridan testified that he placed the napkin into a white paper bag, and sealed and labeled the package in accordance with protocol.

left behind by a suspect[;]" several days later, he collected evidence from the secured "SAFE locker" at the hospital which he submitted to evidence control for later DNA testing; after Victim failed to appear for an appointment with law enforcement to assist in creating a sketch of Driver and failed to return calls to law enforcement the investigation was eventually suspended; approximately one year later, the case was reopened and Victim identified Cooper from a photo array; and based on Victim's photo identification, pursuant to an arrest and a search warrant, Grubb collected a DNA sample from Cooper, through a buccal swab [5] of his inner cheek, for comparison with the DNA profiles developed from the biological materials found on the items previously collected in the case.

The State further called Officer Monn to testify. Monn testified that his involvement with this case began when he responded to a call that there had been an attack. He further stated that he took Victim's initial statement, from which he compiled a police report, and transported her to the hospital to be examined. Without objection, Monn additionally read Victim's statement into the record.

Matthew Stielper ("Stielper"),[6] a forensic biologist who had previously worked at the BPD Lab [7] also testified for the State. After being accepted by the trial court as an expert in "forensic serology," [8] Stielper explained that his job was to

---

5. "A 'buccal' sample is obtained by swabbing the cheek area inside of a person's mouth." *Derr v. State*, 434 Md. 88, 99, 73 A.3d 254 (2013) (quotation and citation omitted); *see also State v. Raines*, 383 Md. 1, 5–6 & n. 6, 857 A.2d 19, 22 & n. 6 (plurality) (describing the taking of a buccal swab as having the inside of one's cheek swabbed).

6. In the briefs there is some discrepancy about the spelling of this name. We adopt the spelling he stated during trial.

7. At the time of trial, Stielper was working at the Baltimore County Police Department's Crime Laboratory.

8. Stielper testified that "[s]erology is the study and identification of body fluids. And the body fluids that we're concerned with in the field of forensic science is blood, semen and saliva."

"analyze and identify any body fluids that we find on evidence and if we identify those body fluids we prepare those samples to be sent for DNA analysis." After explaining, among other things, the test used to detect semen, Stielper stated that he worked on the present case and had analyzed 13 items of evidence, including the napkin and swabs taken from Victim, for the presence of biological fluids. Stielper testified that he identified the presence of semen on the swabs of Victim's vaginal, vaginal cervical, anal, and perivaginal areas. Additionally, Stielper testified that the tests were positive for the presence of sperm and seminal fluid on the napkin.

Ashley Fulmer ("Fulmer"), a DNA analyst at Bode testified that another Bode DNA analyst, Sarah Shields ("Shields"), analyzed the DNA extracted from the biological material on the items submitted to Bode, namely swabs collected from Victim, Victim's blood sample, and the napkin. Fulmer also stated that she is Shields's supervisor. Over objection, Fulmer introduced a report prepared by Shields indicating the results of her testing. Fulmer explained the results to the jury which indicated that swabs from the vaginal, perivaginal, and anal regions contained a male DNA profile for the same unspecified male, "male 1," and the biological material on the napkin contained a DNA profile for a different unspecified male, "male 2." [9] Also over Cooper's objection the report was entered into evidence.

Rania Stanos, the DNA technical leader for the Baltimore City Police Department Crime Lab, testified that she analyzed the DNA profile developed from the biological material on the swab of Cooper's inner-cheek and compared it to the results of the DNA tests conducted by Bode on the swabs taken from Victim and the napkin. Santos stated that her conclusions were that the DNA profile developed from the biological materials on the napkin sample, "male 2," were consistent with Cooper's DNA profile from the swab of his inner-cheek.

---

9. The swabs and the napkin also contained DNA from Victim.

Finally, a forensic nurse examiner, Daniel Sheridan ("Sheridan"), testified that he conducted the forensic examination of Victim when she was taken to the hospital. He stated that he collected forensic evidence from Victim including the swabs and the napkin which Sheridan packaged in a sealed bag. Sheridan additionally stated that Victim complained of pain in the rectal area and Sheridan observed small tears in that area. Finally, Sheridan testified that Victim told him that she had consensual unprotected sexual relations with her boyfriend three days prior to the attack. After being asked by the prosecutor, Sheridan testified that it was possible that Victim's boyfriend could be the source of the biological material found on swabs of Victim's vaginal, perivaginal, and anal swabs, or in other words, that Victim's boyfriend could be "male 1."

There is no evidence that Fulmer or Santos participated in or observed the DNA testing of the biological material found on the napkin. Additionally, Shields (analyst) was never called to testify, and the State never showed that she was unavailable or that Cooper had a prior opportunity to cross-examine her. Moreover, over Cooper's objection, the report prepared by Shields indicating, among other things, the results from the DNA test on the napkin, was admitted into evidence.

During the State's closing arguments, the prosecutor reviewed the testimony of its witnesses and focused primarily on Victim's testimony. The prosecutor expressed that Victim identified Cooper as her attacker, both in a photo lineup and in-court, and then indicated, "[the State] ha[s] more than that. With that napkin we had the analyst from the Baltimore City Lab come and [she was] able to [tell] you whose DNA that was." Presenting her conclusion to the jury, the prosecutor stated, "[a]nd low and behold, ladies and gentlemen, you know whose DNA that was? It was Orville Cooper's DNA. That was the same person that [Victim] said raped her, sodomized her, forced [her] to perform oral sex. That DNA on that napkin came back as the same person [Victim] has told you did all these terrible things to her."

As noted above, the jury returned guilty verdicts against Cooper for second degree rape, and multiple counts of second, third, and fourth degree sexual offenses and one count of second degree assault. Additional facts will be supplied as necessary to address Cooper's challenges to his conviction.

## DISCUSSION

### I. DNA Analysis of the Biological Material on the Napkin

Cooper's first three challenges to his conviction relate to the introduction of the report prepared by Sarah Shields, indicating the results of the DNA tests relating to the physical evidence in this case (the "Shields report"), through the testimony of Ashley Fulmer. Cooper contends:

> Bode ... analyst, Sarah Shields, conducted the testing and analysis of the [physical evidence in this case]—consisting, in relevant part, of the vaginal swab, perivaginal swab, anal swab, and [the napkin]—in order to obtain any DNA profiles from each. Sarah Shields did not testify at trial. Instead, the State was permitted, over objection, to adduce testimony from another Bode ... analyst, Ashley Fulmer, regarding the analysis that had been done by Sarah Shields. Over further objection, the trial court admitted Sarah Shields'[s] report into evidence through Ashley Fulmer. The trial court erred in admitting the report and/or attendant testimony: 1) without a proper foundation in the form of a demonstrated chain of custody of the evidence tested; 2) in violation of Maryland evidentiary rules prohibiting the admission of hearsay; and/or 3) in violation of [Cooper's] State and/or federal constitutional right of confrontation. (Footnote and citations omitted.)

Ashley Fulmer, "a supervisor and a senior DNA analyst" at Bode, was called as an expert witness during the State's case-in-chief. During Fulmer's voir dire, among other things, she testified about the duties of a DNA analyst at Bode, and more specifically about her role as a supervisor. Fulmer noted that she "basically manage[s] a group of DNA analysts[,]" "over-

see[s] the functioning of that group[,]" and reviews case files. Fulmer testified that reviewing case files includes both an "administrative review" that "evaluate[s] sort of, you know, grammar, there's punctuation and that sort of stuff[,]" and a "technical review" where she would "go through everything in the case, make sure procedures were followed, make sure things were tested in the right manner and all of that. Make sure that the results, any conclusions that were made are reported accurately."

After being accepted as an "expert in forensic DNA analysis[,]" Fulmer testified about the "quality assurance system at work" at Bode, including that: the building, the evidence department, and the laboratories are secure; there are "educational requirements of the analysts;" there is "proficiency testing;" everyone in the lab wears "protective gear" including lab coats, goggles, and gloves; all of the equipment is "maintained and calibrated on a regular basis;" and Bode runs controls on all of the samples and case files are reviewed. Fulmer then explained to the jury, in general, what DNA is, and how it is analyzed by examining thirteen locations on DNA identified in accordance with the FBI guidelines.

Fulmer further testified about the procedures generally used at Bode from the time evidence arrives to be analyzed. Eventually, Cooper's attorney objected to Fulmer's testimony concerning the general practices employed at Bode, noting that "my objection is that we're not dealing with this case. We're dealing with general procedure. If we're going to get an education in DNA procedure—" at which point the trial judge responded that Fulmer could testify about general procedures because she is an expert. When Cooper's counsel again pointed out that his "quarrel is that we're not hearing about what happened in this case[,]" the court concluded that "[Fulmer] gets to it when she wants to get to it" and that "she can talk about general procedure if she wants."

When asked if there is a way that the lab protects against evidence becoming "mixed up with other cases[,]" Fulmer pointed out that analysts only work on one case at a time and

"within a case [an analyst] only ever ha[s] one item of evidence open at a time." Fulmer stated that once an analyst finishes "process[ing]" one item, the analyst is required to seal it back up with evidence tape and sign that it is sealed before moving on to another piece of evidence.

Fulmer then testified about the present case. She expressed that in May of 2006, when the biological material on swabs taken from the victim and the napkin were tested at Bode, she supervised Shields. Noting that she did not review all of Shield's cases, because there were multiple reviewers on her team, Fulmer testified that she did review Shields's work in the present case. When asked by the prosecutor what she reviewed, Fulmer testified:

> When it comes to me for review I have all the data that [Shields] generated in the processing of this case. I have her final case report. So I'll sit down and make sure, like I said, that the data—she performed the right procedures, that the data looks accurate and then I also agree with the results that she generated and issued in her report.

After Fulmer expressed that she had read the report before Shields "sign[ed] off" on it, the prosecutor gave Fulmer a copy of the first two pages of the Shields report. Fulmer then, over objection, testified that the pieces of evidence received and tested by Bode in the present case were items labeled as swabs from Victim's vaginal, perivaginal, and anal regions, "stains from tissues" (the napkin), and a "reference standard" from Victim. Fulmer additionally testified about the specific procedures used at Bode to test the different items and evaluate the results. When asked by the prosecutor, "[i]n this particular case, the case we're speaking about today, based on your review of this file and the fact that you were her [Shields's] technical reviewer, were those the processes that were followed?[,]" Fulmer answered yes. When the prosecutor then asked, "[a]nd was there any results to be evaluated?[,]" again Fulmer agreed. When the prosecutor then asked Fulmer to tell the jury about the results, Cooper

objected and the trial judge directed the parties to approach the bench for a conference:

\* \* \*

[Cooper's Attorney]:—I'm objecting A, to the question, can you tell us about the results. I don't really know what that means. I know.

[Judge]: Yeah, no, no, no, no.

[Cooper's Attorney]: And I'm objecting to her giving any opinion of somebody else's analysis—

[Judge]: Right. That's why I brought you up, just I wanted to deal with that. Do you want to be heard on that so I can rule and then we can move on?

[Cooper's Attorney]: Your Honor, there's been no evidence of the items. First of all, there's been no chain of custody. We don't know anything that—what the State—the police department. We don't know how the [napkin] that was recovered with the sperm. No chain of custody has been established.

She didn't—we have no chain of custody that has been established that the evidence was from Baltimore City to Bode testing lab. We have her statement that this is her normal procedure. That's fine. There's no testimony it happened in this case.

[Judge]: Okay.

[Prosecutor]: There's no chain of custody required. It goes to weight not admissibility. Furthermore the State contends there has been a chain of custody because we've talked about the CC numbers and it's been admitted the CC numbers and it's been (inaudible). So the State, although it feels that we don't have to prove chain of custody that we have more than proven chain of custody.

[Judge]: Okay. Now I know what the argument is so that we can move on. I'm going to overrule the objection. The issue has to do with—I do agree is with the weight and how you're going to argue it as opposed to whether it actually comes in. And then also I'm ruling on the fact that she can testify to—as an expert to the reports of another individual.

After the trial judge's ruling, Fulmer proceeded to read and explain the results indicated in the Shields report. Of particular importance to this case, Fulmer identified that biological material on the swabs from Victim's vaginal, perivaginal, and anal region contained a mixture of DNA from Victim and the same male, labeled "male 1," and on the sample from the napkin there was DNA from a different male, "male 2." After Fulmer read and explained the content of the Shields report to the jury, the report was admitted into evidence over Cooper's objection. Fulmer's testimony then addressed the controls generally in place to ensure the reliability of the test results formulated at Bode. Finally, Fulmer finished her direct testimony by answering two questions from the prosecutor:

[Prosecutor]: And when you read through Ms. Shield[s]'s paperwork and read through her results and looked at everything[,] did you concur with her results?

[Fulmer]: Yes.

[Prosecutor]: Okay. And did you have any reason to believe that something didn't perform as it was expected to?

[Fulmer]: No.

## A. Chain of custody of the napkin.

■ In his brief on appeal, Cooper argues that "[t]he trial court erred in admitting the [Shields] report and attendant testimony [from Fulmer] without a proper foundation in the form of a demonstrated chain of custody of the evidence tested." Cooper contends that "in order to be admissible, real evidence must be in substantially the same condition that it was in at the time of the crime and must be properly identified[ ]" (quotation omitted), and "when the State seeks to introduce real evidence in a criminal trial, it has the onus of establishing a proper chain of custody for that evidence[.]" Cooper asserts that:

In the instant case, Detective Grubb testified that he submitted the SAFE kit to evidence control. Police [f]orensic [b]iologist, Matthew [Stielper], then testified that his report reflected his examination of the items of evidence in this

case and that he later packaged and resealed the items. However, there was no testimony or evidence accounting for how the evidence was forwarded to Bode Technology. Ashley Fulmer spoke only in general terms regarding how evidence is obtained and maintained by Bode Technology. There was no testimony or evidence that the specific items of actual evidence in this particular case were obtained and maintained by Bode in accordance with their general procedure up to and through testing and analysis, much less any evidence of how they were obtained and maintained at all. There was no accounting by Bode analysts for the handling of the actual evidence in this case, let alone any accounting sufficient to establish the chain of custody necessary in order [to] guarantee its integrity from seizure to analysis by Bode Technology. Under the circumstances, it was error to admit the report and subsequent related testimony regarding the results of tests that were conducted on evidence that was not duly accounted for. Reversal is required on this basis alone. (Footnote and citations omitted.)

The State responds in its brief that Cooper's objection on the grounds of chain of custody was "properly overruled, as it was without merit." The State further contends that Cooper, on appeal, must show that his objection had merit and that "the trial court abused its discretion in determining that a sufficient chain of custody had been established[,]" which Cooper failed to do. In addition, the State asserts that "[e]stablishing an adequate 'chain of custody' requires showing, to the satisfaction of the trial court, that the provenance of a particular piece of evidence can be established well enough to negate the likelihood of tampering." (Citation omitted.) The State argues that "it is unclear what 'chain' Cooper felt had not been connected regarding Fulmer's testimony[,]" but concluded that the objection "focus[ed] on the chain of custody connecting the semen-soaked [napkin] that the victim gave to the police with the semen that Shields tested at Bode under Fulmer's supervision." The State asserts that the prosecution had, through Fulmer and earlier witnesses, "sufficiently established that the item tested by

Shields was what it purported to be, and that it had not been tampered with prior to testing."

It is helpful to review the information that had been presented through testimony by the time the trial judge had admitted the Shields report. Because the DNA that was matched to Cooper's DNA was from the napkin, we focus on the chain of custody for the napkin.

First, Victim testified about her attack and the events after her attack, including that her attacker ejaculated into her mouth, she spit his ejaculate into a napkin, and she still had the napkin in her hand when she arrived at the hospital. This was bolstered by Roommate who testified that he saw the napkin in her hand when she came in the door.

Detective Grubb then testified that: (1) Victim had a SAFE exam, which was performed "[t]o collect forensic evidence that . . . may have been left behind by a suspect[;]" (2) several days later, he removed from the "SAFE locker" the physical evidence collected as a result of the SAFE exam and submitted it to the police evidence control unit; (3) the results of SAFE exams are put in the SAFE locker by the nurse who conducts the SAFE exam after he or she completes the exam; (4) a "SAFE locker" is a locker that is in the room next to where they conduct the exams and is secured behind two locked doors; and (5) the people with access to the SAFE locker are the "SAFE nurses, security that unlocks it and the primary detective who recovers it." Grubb additionally testified that when submitting the evidence to the police evidence control unit, an officer "fill[s] out a 56 form which is a form [that] just states what the item is to be submitted to evidence control . . . ," and that they are submitted to evidence control "[f]or chain of custody purposes, to ensure that it's not tampered with and so that the [police DNA] technicians can recover it . . . ."

Grubb further stated that when the police get pieces of evidence from SAFE exams they are: (1) "contained in an envelope and a bag if there's additional clothing that is too large or bulky to fit into the envelopes[;]" (2) sealed with a

"piece of tape over it so that it cannot be tampered with[;]" and (3) marked with "a biohazard symbol on it and it's marked SAFE exam, Sexual Assault Forensic Exam." He further testified that in the present case, the complaint number was also written on the evidence taken from the SAFE exam. He also indicated that he "believed" that both Grubb's name and Victim's name were on the package. Grubb testified that the material is sealed with tape and marked with identifying information "[s]o that they can't be tampered with and . . . the name of the detective and the victim so we know who it came from and who is the primary investigator on the case."

Matthew Stielper, the forensic biologist who testified that he conducted tests on the pieces of physical evidence in the case and found semen on the napkin, provided further testimony about the chain of custody. He first explained how evidence in general is handled, noting that: (1) the evidence is brought to the biology unit and "it's placed in our evidence vault which is secured" and "[o]nly analyst whose ID card will let them in there, you know, can access that evidence[;]" (2) once he collects the evidence "out of our vault I sign for it on our chain of custody indicating that it's in my possession and nobody else's so I'm responsible for it[;]" (3) before he opens the evidence and puts it on his "bench" to be tested, he will clean his bench to "make sure, you know, everything is clean[;]" and (4) he will "document whether the evidence was properly sealed to make sure nobody tampered with it beforehand."

Stielper then confirmed that he worked on the "case under CC number 068B07346," and stated that all of the items under that "property number . . . came from the rape kit that was collected from the victim." After testifying about the tests conducted on the swabs from Victim, Stielper addressed his testing of the item "listed as the tissue of the ejaculate[,]" or in other words, the napkin. He noted that "I don't have anything in my notes about it being improperly packaged so I don't recall what—what the outer package was." When asked, however, if it would have been "enclosed in something" and if it was not, whether he would have documented that in his notes, Stielper answered "yes."

After again agreeing that when he received the evidence in this case it was sealed and had "the CC number," Stielper stated that when he was finished with his analysis of the different items, including the napkin, he "properly seal[ed] the packages again." Elaborating, Stielper testified that he "put some evidence tape across wherever I open the package and after I put the blue tape on I sign my initials and date over that seal. So in other words, half of my signature is on the tape and the package as well. That way if any kind of tampering of that evidence occurred it would be obvious based on how I wrote my signature over that seal."

Next, Ms. Fulmer, the supervisor from Bode, testified. As noted above, she testified about the general safeguards in place at Bode to ensure the reliability of DNA test results. Although Fulmer also testified that she does not review every one of Shield's cases, when asked if she reviewed "[Shields's] case under case number 068B as in boy, 07346[,]" Fulmer said yes. Looking at the Shields report, which indicated the results of Shields's analysis in the case, Fulmer identified the materials tested, including the napkin, and when she was asked to testify about the results indicated on the Shields report, Cooper objected.

As noted above, Cooper argued at trial that the State failed to establish the chain of custody of the napkin, specifically between the Baltimore City Police and Bode. The prosecutor responded that the State did not have to establish chain of custody because "[i]t goes to weight not admissibility[,]" and furthermore the State sufficiently established the chain of custody. The trial judge agreed with the State and overruled the objection noting "[t]he issue has to do with—I do agree is with the weight and how you're going to argue it as opposed to whether it actually comes in."

When determining whether a proper chain of custody has been established courts examine whether there is a "reasonable probability that no tampering occurred." *Breeding v. State*, 220 Md. 193, 199, 151 A.2d 743, 747 (1959). As the Court of Special Appeals has noted in *Wagner v. State*, 160

Md.App. 531, 864 A.2d 1037 (2005), "[t]he circumstances surrounding [an item of evidence's] safekeeping in that condition [that is substantially the same as when it was seized] in the interim need only be proven as a reasonable probability[,] and in most instances is established by responsible parties who can negate a possibility of tampering and thus preclude a likelihood that the thing's condition was changed." 160 Md.App. at 552, 864 A.2d at 1049–50 (quotation omitted).

There is sufficient evidence in the record for the conclusion that "no tampering occurred" with respect to the napkin. The Shields report shows the results of tests from case "06–8B–07346," the same number that appeared on the sealed envelopes containing evidence which Stielper tested in the BPD lab. The chances of the napkin not being the napkin Victim brought to the hospital but somehow ending up being labeled as part of the case is unlikely. Similarly, the chances of Cooper's DNA being placed on the napkin through tampering when the napkin had been transferred from the Victim to a locker behind locked doors at the hospital to the evidence control unit to the police laboratory and then to Bode is remote. Because the evidence presented indicates that it is unlikely that tampering undermined the integrity of the napkin, we conclude that the State has provided sufficient testimony to establish the chain of custody as to the napkin. *See Nixon v. State,* 204 Md. 475, 483, 105 A.2d 243, 247 (1954).

## B. Admissibility of the Shields report under the rules of evidence.

In his appellate brief, Cooper asserts that "[t]he trial court erred in admitting the report and attendant testimony because it amounted to inadmissible hearsay." Cooper notes that:

In the instant case, Ms. Fulmer identified State's Exhibit 4 as follows: "This is the first two pages of the report that was generated in this case by Sarah Shields," and then Ms. Fulmer proceeded to testify as to the contents of that report (*i.e.,* "the results of the analysis by Ms. Shields"). The entirety of [ ] Shields'[s] report and [ ] Fulmer's testimony

thereon was hearsay, and its substance was clearly offered for the truth of those matters. As to the report, the State made no effort to show that the rule proscribing the admission of hearsay did not apply or what, if any, exception to that rule applied. Likewise, there was no proffer by the State as to what exception, if any, applied to Ms. Fulmer's testimony regarding the report. The trial court erred in admitting the report and the subsequent testimony and the error was not harmless. Reversal is required on this basis alone. (Footnote and citation omitted.)

The State responds in its brief that the trial judge correctly ruled that Fulmer, an expert witness, could testify about the reports of another individual pursuant to Maryland Rule 5–703, as the basis for her expert testimony. The State highlights that:

Fulmer was being asked if, in her expert opinion, Shields had complied with the appropriate standards and had developed accurate data regarding the various items she had tested, such that the report she generated gave accurate DNA profiles of the various contributors to the biological evidence recovered from the [napkin] and the swabs. The court did not abuse its discretion in determining that the jury could, in fact, hear about the raw data generated by Shields. Such information would be useful to the jury in evaluating both Fulmer's testimony that the proper procedures were followed and accurate data generated, and, later, Rania Santos's testimony that one of the unknown DNA profiles generated by Shields was consistent with a DNA profile of Cooper that Santos generated. . . . [A]ll of Fulmer's testimony was essentially a prologue to Santos's testimony. It was Fulmer's testimony that established the provenance of the unknown DNA profile that Santos compared to Cooper's profile. Fulmer's expert opinion that the report was accurate and prepared in compliance with the rigorous procedures put in place at Bode was meant to help the jury assign the proper weight to Santos's finding that the unknown DNA profile was consistent with Cooper's. It was entirely consistent with Rule 5–703 to allow the jury to

hear and see the report in question, under the circumstances, and the court did not abuse its discretion in allowing the report into evidence.

As noted, when trial judge permitted, over objection, Fulmer to testify to the content of the Shields report, he stated "she can testify to—as an expert to the reports of another individual." We agree with the State that this can be understood to mean that under Rule 5–703, the Shields report was admitted as the basis for Fulmer's expert opinion.

Almost 80 years ago, Judge Francis Neal Parke wrote for this Court that "[i]t has been the practice in this jurisdiction for some years to permit an expert to express his [or her] opinion upon facts in the evidence which he [or she] has heard or read, upon the assumption that these facts are true." *Quimby v. Greenhawk,* 166 Md. 335, 338, 171 A. 59, 61 (1934). Maryland Rule 5–703(a) codifies this, permitting an expert to base his or her opinion on "first-hand knowledge, hearsay, or a combination of the two." 6 Lynn McLain, *Maryland Practice: Maryland Evidence State and Federal* § 703:1(a) (2d.2001). And, if evidence constitutes inadmissible hearsay, it cannot be admitted as substantive evidence, Maryland Rule 5–703(b) permits a trial judge, in his or her discretion, to admit evidence as the factual basis for the expert's opinion if the evidence is unprivileged, trustworthy, reasonably relied upon by the expert, and necessary to "illuminate" the expert's testimony. *See Brown v. Daniel Realty Co.,* 409 Md. 565, 601, 976 A.2d 300, 321 (2009) ("[F]our elements must be satisfied for a document to be admissible under this rule. The document must be (1) trustworthy, (2) unprivileged, (3) reasonably relied upon by an expert in forming her or his opinion, and (4) necessary to illuminate that expert's testimony.").

Cooper does not argue that the Shields report was privileged. Furthermore, we infer from the trial judge's admission of the Shields report that he found it to be trustworthy. Moreover, under Section 10–915 of the Courts and Judicial Proceedings Article, the Maryland Legislature has identified the results of DNA tests, or in other words, the production of

DNA profiles, like those in the Shields report, to be generally "reliable and admissible." *Armstead v. State*, 342 Md. 38, 54, 673 A.2d 221, 229 (1996). In *Armstead*, we noted, however, that "[w]hile ordinarily DNA evidence will be admissible, the trial judge retains the discretion to exclude DNA evidence if errors in the laboratory procedures render it so unreliable that it would not be helpful to the trier of fact." 342 Md. at 63, 673 A.2d at 233 (citation omitted). As noted above, in the present case, Fulmer testified about the procedures used at Bode to ensure the reliability of the results, including securing evidence that is to be tested, requiring analysts to meet certain educational requirements and submit to proficiency testing, requiring analysts to wear protective gear, testing only one sample at a time to prevent mixing of DNA samples, and that supervisors review the work of analysts.

We also determine that the trial judge did not abuse his discretion in concluding that Fulmer relied upon the Shields report and its admission illuminated her testimony. Fulmer testified that when she reviewed Shields's work, she "ma[de] sure ... [Shields] performed the right procedures, that the data looks accurate and then I also agree with the results that she generated and issued in her report." In other words, Fulmer adopted the results in the Shields report. We conclude that the trial judge did not abuse his discretion in determining that Fulmer relied upon the Shields report. In addition, the trial judge also did not abuse his discretion when he admitted the report into evidence, as the content of the report illuminated the conclusions Fulmer adopted.

## C. Admissibility of the Shields report under the Confrontation Clause.

█ Cooper argues in his brief that "[t]he trial court erred in admitting the [Shields] report and attendant testimony [of Fulmer] in violation of [Cooper's] federal and State right/s of confrontation." Much of Cooper's argument relies on our 2011 opinion in *Derr v. State*, 422 Md. 211, 29 A.3d 533 (2011) (*Derr I*), where we held that the Confrontation Clause was violated by the admission of forensic test results through the

testimony of an expert witness who did not conduct the tests producing those results. The State, in response, argues in its appellate brief that because Cooper did not properly raise his right to confront witnesses in the trial court, "Cooper's Confrontation Clause argument is not preserved for review." [10] Moreover, the State argues that "[e]ven if considered, Cooper's Confrontation Clause argument fails."

On June 29, 2012, the United States Supreme Court (the "Supreme Court") vacated our earlier judgment in *Derr I,* and remanded the case to this Court "for further consideration in light of [the United States Supreme Court's 2012 decision in] *Williams v. Illinois,* 567 U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012)." *Maryland v. Derr,* —— U.S. ——, 133 S.Ct. 63, 64, 183 L.Ed.2d 700 (2012). As a vacated decision, *Derr I* is no longer good law in Maryland. Recently, we issued *Derr v. State,* 434 Md. 88, 73 A.3d 254 (2013) (*"Derr II"*), where we applied *Williams* and held that there was no violation of Mr. Derr's right of confrontation. Applying *Derr II,* we conclude that Cooper's right of confrontation was not violated in this case.

Both the Sixth Amendment to the United States Constitution [11] and Article 21 of the Maryland Declaration of Rights [12] provide a criminal defendant with the right of confrontation. In past cases, we have analyzed these two rights *in pari materia,* or as generally providing the same protection. *See*

10. It appears that there was sufficient and timely objection to preserve the Confrontation Clause issue. We conclude, however, that there is no Confrontation Clause violation in this case.

11. The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Sixth Amendment right to confront witnesses is binding on Maryland through the Fourteenth Amendment. *See Cox v. State,* 421 Md. 630, 642, 28 A.3d 687, 694 (2011) (citation omitted).

12. Article 21 of the Maryland Declaration of Rights states, in part, that "in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him ... [and] to examine the witnesses for and against him on oath[.]"

*Grandison v. State,* 425 Md. 34, 64, 38 A.3d 352, 370 (2012); *Lawson v. State,* 389 Md. 570, 587 n. 7, 886 A.2d 876, 886 n. 7 (2005); *State v. Snowden,* 385 Md. 64, 74 n. 9, 867 A.2d 314, 320 n. 9 (2005). In *Derr II,* we continued this practice and analyzed both the rights under the federal and Maryland Constitutions by applying the United States Supreme Court's analysis of the Sixth Amendment right in *Williams. Derr II,* 434 Md. at 104–05, 73 A.3d at 263–64. As Cooper has failed to persuade us to deviate from reading the two rights *in pari materia* in the present case, we shall analyze whether the Confrontation Clause has been violated by applying *Williams,* as we have interpreted it in *Derr II.*

Since it was decided in 2004, this Court has followed the framework articulated by the Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), to analyze whether the Confrontation Clause has been violated. *See Cox,* 421 Md. at 642, 28 A.3d at 694; *Langley v. State,* 421 Md. 560, 562, 28 A.3d 646, 647 (2011); *State v. Lucas,* 407 Md. 307, 311, 965 A.2d 75, 78 (2009); *State v. Snowden,* 385 Md. 64, 68, 867 A.2d 314, 316 (2005). Under *Crawford,* and its progeny, the right of confrontation is implicated only when two conditions are met: the challenged out-of-court statement or evidence must be presented for its truth and the challenged out-of-court statement or evidence must be "testimonial." *See Derr II,* 434 Md. at 106–07, 73 A.3d at 265; *Cox,* 421 Md. at 643, 28 A.3d at 694; *Michigan v. Bryant,* 562 U.S. ——, 131 S.Ct. 1143, 1153, 179 L.Ed.2d 93, 104 (2011); *Crawford,* 541 U.S. at 59–60 n. 9, 124 S.Ct. at 1369 n. 9, 158 L.Ed.2d at 197–98 n. 9. Cooper's argument that the admission of the Shields report violated his right to confront witnesses fails because the Shields report is not testimonial under *Williams,* as we have interpreted the case in *Derr II.*

In *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) and *Bullcoming v. New Mexico,* 564 U.S. at ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court concluded that the forensic test results at issue in those cases were testimonial and their introduction violated the Confrontation Clause. The Court, however, did

not conclude that all forensic test results are testimonial. In *Williams*, five members of the Supreme Court concluded that admission of the results of a DNA test conducted by a private laboratory were not testimonial, and therefore, the admission of the results through the testimony of an expert witness who did not participate in the testing, and did not work at the lab where the DNA was tested, did not violate the Confrontation Clause.

There was no majority opinion of the Court in *Williams*. Both the plurality opinion, authored by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer,[13] and Justice Thomas's opinion, concurring in judgment only, agreed that the introduction at trial of the challenged forensic test result did not violate the Confrontation Clause because the result was not "testimonial." In *Derr II*, we were able to discern from the Plurality's opinion and Justice Thomas's concurrence, however, an applicable standard for determining whether forensic test results are testimonial for the purposes of the Confrontation Clause. We applied the standard articulated by the Supreme Court in *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977) (quotation omitted): "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds...." Pursuant to *Marks*, we determined that "the narrowest holding of *Williams* is that a statement, at a minimum, must be formalized to be testimonial." *Derr II*, 434 Md. at 115, 73 A.3d at 270. Therefore, we conclude that the Shields report is not sufficiently formalized to be testimonial, and its admission does not offend the Confrontation Clause.

---

**13.** Justice Breyer wrote a concurring opinion. His opinion, however, stated "the plurality's opinion is basically consistent with the views set forth [in his concurring opinion, and so] I join that opinion in full." 567 U.S. at ——, 132 S.Ct. at 2252, 183 L.Ed.2d at 125 (Breyer, J., concurring).

In *Derr II,* this Court determined that "courts should rely on Justice Thomas's concurrence to determine whether a statement is formalized." *Derr II,* 434 Md. at 116, 73 A.3d at 271. In *Williams,* Justice Thomas explained that testimonial statements include "formalized testimonial materials, such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogue, such as custodial interrogation." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (citation and quotation omitted). Applying this standard, Justice Thomas concluded that the challenged forensic evidence at issue in *Williams* was nontestimonial because it "lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (citation omitted). Justice Thomas's concurrence further notes that the challenged "report is signed by two reviewers, but they neither purport to have performed the DNA testing nor certify the accuracy of those who did. And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 133–34 (Thomas, J., concurring in judgment) (citation omitted). Finally, when Justice Thomas distinguished the results in *Williams* from those found to be testimonial in *Melendez–Diaz* and *Bullcoming,* he noted that the reports at issue in *Melendez–Diaz* were "sworn to before a notary public by [the] analysts who tested the substance . . . [,]" and the report at issue in *Bullcoming* "though unsworn, included a Certificate of Analyst signed by the forensic analyst who tested the defendant's blood sample" and the analyst affirmed the proper handling of the sample, that the statements in the report were correct, and that the analyst had "followed the procedures set out on the reverse of the report." 567 U.S. at ——, 132 S.Ct. at 2260, 183 L.Ed.2d at 134 (Thomas, J., concurring in judgment) (quotation omit-

ted). Justice Thomas concluded that "what distinguishes the two [results in *Bullcoming* and *Williams* ] is that the [challenged] report [at issue in *Williams*], in substance, certifies nothing." *Id.* (citation omitted).

The Shields report, as it appears in the record, is a two page document indicating, among other things, when the report was created, what items were tested, what procedures were used to develop the results, and the DNA results developed from the testing. Nowhere on either page of the report, however, is there an indication that the results are sworn to or certified or that any person attests to the accuracy of the results. Although Bode developed the results at the request of the Baltimore City Police Department, the Shields report is not the result of any formalized police interrogation. Therefore, applying Justice Thomas's reasoning we conclude that the Shields report lacks the formality to be testimonial. Because a violation of the Confrontation Clause requires that the offered statement or evidence be both testimonial and introduced for its truth, we conclude that the introduction of the Shields report at trial did not violate Cooper's right of confrontation.

## II. Other Allegedly Inadmissible Hearsay

Cooper also alleges in his brief that out-of-court statements by Victim were admitted through the testimony of Roommate and Detective Grubb in violation of the rule against hearsay. Cooper asserts that the trial judge improperly admitted these statements as "prompt reports" of sexual assault victims under Maryland Rule 5–802.1(d).[14] Relying on the Court of Special Appeals's decisions, *Cole v. State*, 83 Md.App. 279, 574 A.2d 326 (1990) and *Parker v. State*, 156 Md.App. 252, 846

---

**14.** *Md. Rule 5–802.1 provides:*

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule: ...
(d) A statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected if the statement is consistent with the declarant's testimony; ...

A.2d 485 (2004), Cooper argues that Rule 5–802.1(d) limits the admission of the testimony to only "the fact that the complaint was made, the circumstances under which it was made, and the identification of the culprit," but does not allow for excessive narrative details. Cooper contends:

> In the instant case, the repeated reiterations of [Victim's] story by both [Roommate] and Detective Grubb far exceeded the detail otherwise permissible in relating the mere fact of the sexual assault, as is otherwise contemplated by the exception at issue. This case involved a very suspicious claim of rape. [Victim's] testimony was, to say the least, highly suspect, and the admission of the bolstering testimony by both [Roommate] and Detective Grubb recounting the details of [Victim's] narrative was highly prejudicial. Detective Grubb's testimony additionally served only [to] clothe [Victim's] story with the mantle of authority as delivered by a police officer. Reversal is required.

The States responds in its brief that pursuant to Rule 5.802.1(d), "once the victim's veracity has been challenged, the State is allowed to elicit additional details concerning the prompt complaint. In this case, the more detailed versions of the prompt complaints were admitted only after Cooper had— in his opening statement and his cross-examination of the victim—attacked the credibility of the victim." The State further argues, "Cooper does not at all address the court's alternative basis for admitting the victim's statements. The statements that were admitted were excited utterances, and were therefore admissible as exceptions to the hearsay rule."

■ We need not, and do not, decide if the State's interpretation of Rule 5–802.1 is correct. This is because, as the State notes, Victim's out-of-court statements, as recounted by both Roommate and Detective Grubb, were admissible under the excited utterance exception to the rule against hearsay codified in Maryland Rule 5–803(b)(2).[15]

---

**15.** Md. Rule 5–803 indicates:

The first testimony Cooper challenges is Roommate's testimony. The important portions for analyzing whether inadmissible hearsay was admitted are as follows:

[Prosecutor]: Do you remember anything unusual happening on February 16th, 2006?

[Roommate]: I remember being waken up by a frantic [Victim] coming into the home. I thought somebody was breaking in the way that she came in.

[Prosecutor]: Tell me how she came in.

[Cooper's Attorney]: Objection

[Judge]: Overruled. Go ahead. You can answer.

[Prosecutor]: You can answer.

[Roommate]: She came in very hysterical. She woke me out of my sleep. I came upstairs to see what was wrong with her and she couldn't really like talk to me at first, but after I talked to her for a while because she was like crying and emotional, she told me she had been raped.

[Prosecutor]: Once she told you she had been raped, what, if anything did you do?

[Roommate]: I just—I tried to—I tried to grab her and pull her in the house, but when I put my hands on her she jumped away from me. . . .

\*     \*     \*

[Prosecutor]: What did [Victim] tell you other than being raped? What specifically did she tell you about what had happened to her?

[Cooper's Attorney]: Objection.

[Judge]: Approach.

(Counsel[s] and [Cooper] approached the bench and the following ensued:)

---

The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .
(b) Other exceptions. . . .
(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

[Judge]: What's your basis?

[Cooper's Attorney]: Hearsay.

[Judge]: What's your basis?

[Prosecutor]: (inaudible) sexually assaultive behavior as well as excited utterance.

[Judge]: What do you want to say?

[Cooper's Attorney]: Hearsay.

[Judge]: Overruled.

(Counsel[s] and [Cooper] returned to the trial tables and the following ensued:)

[Judge]: Overruled. You may proceed.

[Cooper's Attorney]: Yes, Your Honor.

[Prosecutor]: Let me repeat my question. [What] exactly did she say to you? You said that she said she had been raped. What specifically did she tell you?

[Roommate]: She told me that—she told me [she] had got raped. After I talked to her I asked her what had happened. Like,—

[Cooper's Attorney]: Objection.

[Judge]: Sustained.

[Roommate]: I asked her—

[Judge]: When I say sustained, sir, you can't answer. Next question.

[Prosecutor]: She told you she got raped. And did she explain how this happened?

[Cooper's Attorney]: Objection.

[Judge]: Overruled. That's a yes or no. Did she explain, sir?

[Roommate]: She explained—

[Judge]: Next question.

[Prosecutor]: And how did she explain it?

[Cooper's Attorney]: Objection.

[Judge]: Overruled.

[Roommate]:—she explained it that—that she was trying to catch a hack to work and the person that she caught the

hack from had took her down to Mount Claire Junction and asked her to give him oral sex and she said that she was raped vaginally, anally. I can't—I think she said she was robbed as well.

For our analysis, the pertinent portion of Detective Grubb's testimony was as follows:

[Prosecutor]: And what happened once you were at the [ ] [h]ospital?

[Grubb]: I interviewed the victim.

[Prosecutor]: And when you met with [Victim] what was her demeanor?

[Grubb]: She was emotional and at times tearful.

[Prosecutor]: And what, if anything did she tell you?

[Cooper's Attorney]: Objection.

[Judge]: Sustained.

[Prosecutor]: May we approach, Your Honor?

[Judge]: You may.

(Counsel[s] and [Cooper] approached the bench and the following ensued:)

[Prosecutor]: I'm assuming [Cooper's Attorney is] objecting for hearsay.

[Judge]: That's up to him.

[Prosecutor]: What are you objecting for?

[Cooper's Attorney]: Hearsay.

[Prosecutor]: It's a prompt report of sexual assaultive behavior. It's a hearsay exception. As well as an excited utterance.

[Judge]: Yeah, but—well, all I'll say is based on the testimony presented by this officer the objection is sustained.

[Prosecutor]: It's a prompt report of sexual assaultive behavior.

[Judge]: Again, based on what has been taken by this officer so far the objection is sustained.

(Counsel[s] and [Cooper] returned to the trial tables and the following ensued:)

[Prosecutor]: Detective Grubb, how soon after the sexual assault took place did you see the victim at [the hospital]?

[Grubb]: I believe it was approximately an hour.

[Prosecutor]: What clothes was she in?

[Grubb]: I don't recall.

[Prosecutor]: Had she changed clothes since the sexual assault?

[Cooper's Attorney]: Objection.

[Judge]: If you know.

[Grubb]: To my knowledge she had not.

[Prosecutor]: What specifically did the victim say to you?

[Cooper's Attorney]: Objection.

[Judge]: Overruled.

[Prosecutor]: What did the victim say to you?

[Grubb]: She advised that she was standing on Pratt and Pulaski Street when she was approached by a black male in a dark vehicle. He asked her if she needed a hack. She accepted. She was then—they drove I believe it was east bound on Pratt Street and at some point the person driving pulled a weapon on her, a knife or a box cutter and demanded oral sex and money from her. She stated that she complied.

He then demanded that she take off her clothes which she complied because she said she was fearful for her life. She advised that the person then vaginally and anally raped her against her will. And—while wearing a condom and afterwards that she was forced to perform fellatio or oral sex on the driver and he removed the condom and then ejaculated into her mouth.

She put the napkin in her pocket. He then drove her and then dropped her back off on Pratt Street.

In this case, there is no real question that both the testimonies of Grubb and Roommate contained hearsay. Both Roommate and Grubb testified as to what Victim told them about the details of her attack. Both witnesses were relaying out-of-court statements by Victim. The State offered both witnesses'

testimonies about what Victim told them happened as substantive evidence of the fact that Victim was picked up by a hack taxi and the driver robbed her and then sexually assaulted her.

■ Although, hearsay evidence generally is inadmissible at trial, Maryland recognizes certain exceptions to the rule which "usually involve those situations where circumstances lend credibility to the statement, thus vitiating the reason for the rule[,]" including for excited utterance. *See Parker v. State*, 365 Md. 299, 312–13, 778 A.2d 1096, 1103 (2001) (quotation omitted). In *Parker v. State*, 365 Md. 299, 778 A.2d 1096 (2001), we noted that when introducing a hearsay statement under the excited utterance exception, "[t]he proponent of a statement purporting to fall within the excited utterance exception must establish the foundation for admissibility, namely personal knowledge and spontaneity." 365 Md. at 313, 778 A.2d at 1104. Additionally, we note that when determining "the admissibility or rejection of 'excited utterance' testimony[,]" we apply "a case by case analysis." *Johnson v. State*, 63 Md.App. 485, 493, 492 A.2d 1343, 1347 (1985).

As to the first condition, personal knowledge, there is no question that Victim had personal knowledge about the details of her attack when she spoke to Roommate and Grubb. She was the victim of the attack.

We are persuaded the second condition, spontaneity, was also met when Victim told both Roommate and Grubb about her attack. As we have held in the past:

> In determining whether a statement falls within the excited utterance exception, we examine the totality of the circumstances. A statement may be admitted under this exception if the declaration was made at such a time and under such circumstances that the exciting influence of the occurrence clearly produced a spontaneous and instinctive reaction on the part of the declarant who is still emotionally engulfed by the situation.

*State v. Harrell*, 348 Md. 69, 77, 702 A.2d 723, 727 (1997) (citations and quotation omitted). Even before "the adoption

of Title 5 of the Maryland Rules [in 1994], we noted that the excited utterance exception requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence." *Harrell,* 348 Md. at 78, 702 A.2d at 727 (quotation omitted). One who is the victim of a sexual assault or rape is clearly involved in a "startling event" that can trigger an excited utterance. *See Davis v. State,* 125 Md.App. 713, 716, 726 A.2d 872, 873 (1999); *Harmony v. State,* 88 Md.App. 306, 320–21, 594 A.2d 1182, 1189 (1991). With both testimonies, we conclude that there was sufficient facts in the record to indicate that when Victim told Roommate and Grubb respectively about her attack she was "still emotionally engulfed by the situation," such that her statements about her attack were "excited utterances." *Harrell,* 348 Md. at 77, 702 A.2d at 727 (quotation omitted).

Roommate testified that he "remember[ed] being waken up by a frantic [Victim] coming into the home[,]" that Victim "came in very hysterical[,]" that when he first approached her "she couldn't really like talk to me at first," and after he "talked to her for a while because she was like crying and emotional, she told me she had been raped." Roommate further noted that he "tried to grab [Victim] and pull her in the house, but when I put my hands on her she jumped away from me...." The fact that Victim was "frantic," "hysterical," unable to initially talk, and recoiled when Roommate tried to help her is sufficient evidence to conclude that she was still under the influence of being attacked when she told Roommate about the attack.

█ Grubb testified that he spoke to Victim after she arrived at the hospital approximately one hour after her attack. It is not clear whether Grubb asked Victim what happened before she told him the details of the attack. The time interval between the event and the statement and whether a statement was made in response to a question are both factors a court can consider, but neither is dispositive. *Harrell,* 348 Md. at 77, 702 A.2d at 727. In *Cassidy v. State,* 74 Md.App. 1, 17, 536 A.2d 666, 674 (1988), Judge Moylan explained that "[a]n obvious factor in determining the continuing

presence of the exciting influence is the time factor." He then noted the discussion of the "time factor" in *McCormick on Evidence:*

> Probably the most important of the many factors entering into this determination is the time factor. If the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement. But as the time between the event and the statement increases, so does the reluctance to find the statement an excited utterance. Although one court has held a statement made fourteen hours after a physical beating to be the product of the excitement caused by the beating, other courts have held statements made within minutes of the event not admissible. Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. *Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing emotional upset will often suffice.*

*Cassidy,* 74 Md.App. at 17, 536 A.2d at 674 (emphasis added) (quoting C. McCormick, *McCormick on Evidence* § 297, at 856 (3d ed.1984)). Examining the totality of circumstances we are persuaded that Victim's statement to Grubb about the attack was sufficient to support the conclusion that the statement was an excited utterance.

Grubb testified that when Victim spoke to him, "[s]he was emotional and at times tearful." Although an hour had passed, as far as Detective Grubb knew, Victim was still wearing the same clothing she wore at the time of the attack. Previously, Victim had testified that when she arrived at the hospital, Grubb introduced himself as "a detective for the Sexual Assault Unit." Under the circumstances, we conclude that it was not a legal error or an abuse of discretion for the trial judge to admit statements made by Victim as excited utterances when she had been sexually assaulted approximate-

ly one hour earlier, her demeanor was such that she was "tearful" and "emotional," she was still wearing the same clothing she wore at the time of the attack, and she was distraught when speaking to a detective after having been brought to a hospital to be examined physically and questioned concerning the attack.

Both Victim's statements to Roommate and Grubb were excited utterances. Therefore, the Roommate's and Grubb's testimony relaying those statements was not inadmissible hearsay.

### III.   Conclusion

In the present case, the introduction of the Shields report was proper and did not violate either the Maryland Rules or Cooper's constitutional rights. Additionally, Victim's statements to Roommate and Grubb were properly admitted as excited utterances. Because we conclude that no constitutional or other legal infirmity has been shown, we affirm Orville Cooper's conviction.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.   COSTS TO BE PAID BY PETITIONER.**

McDONALD, J., Concurs.

Chief Judge BELL dissents from this opinion for the same reasons articulated in the dissenting opinion in *Derr v. State,* 434 Md. 88, 73 A.3d 254 (*Derr II* ).

McDONALD, J., Concurring.

I join the Court's opinion with the exception that I join in the judgment only as to the Confrontation Clause issue, for the reasons set forth in my concurring opinion in *Derr v. State,* No. 6. September Term 2010 (August 22, 2013).