**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2382

September Term, 2008

———————————————————

HAROLD ALBERT NORTON, JR.

v.

STATE OF MARYLAND

———————————————————

Hotten,
Berger,
Arthur,

JJ.

———————————————————

Opinion by Berger, J.

———————————————————

Filed: June 24, 2014

Appellant, Harold Albert Norton, Jr. ("Norton"), was convicted in the Circuit Court for Baltimore County of attempted first degree murder, witness intimidation, assault, three counts of armed robbery, and four counts of use of a handgun. On appeal before this Court, we reversed Norton's convictions and remanded for a new trial, holding that Norton had been denied his Sixth Amendment right of confrontation when a DNA analyst was permitted to testify regarding the work of another DNA analyst. *See Harold Albert Norton, Jr. v. State*, No. 2382, Sept. Term 2008 (filed Nov. 21, 2011) (unreported opinion) ("*Norton I*"). Our original opinion was based upon the holding of the Court of Appeals in *Derr v. State*, 411 Md. 740 (2009) ("*Derr I*").

Following our opinion in *Norton I*, *Derr I* was vacated by the United States Supreme Court and "remanded to the Court of Appeals of Maryland for further consideration in light of *Williams v. Illinois*, 567 U.S.___, 132 S. Ct. 2221, 183 L. Ed.2d 89 (2012)." *Maryland v. Derr*, 133 S. Ct. 63 (2012). The Court of Appeals subsequently issued an opinion in *Derr v. State*, 434 Md. 88 (2013) ("*Derr II*"). Thereafter, on October 21, 2013, the Court of Appeals vacated our opinion in *Norton I* and remanded this case to this Court "for further reconsideration in light of [*Derr II*], 434 Md. 88, 73 A.3d 254 (2013) and *Williams v. Illinois*, 132 S. Ct. 2221, 183 L. Ed.2d 89 (2012)." *State v. Norton*, 435 Md. 266 (2013).

On remand, we address the following issue:

> Whether Norton's right to confrontation was violated when the circuit court permitted one DNA analyst to testify regarding the work of another DNA analyst and admitted the report of the non-testifying DNA analyst.

For the reasons that follow, we shall answer in the affirmative and reverse the judgment of the circuit court.[1]

## FACTS AND PROCEEDINGS

As discussed *supra*, this is the second time this case has been before this Court. We set forth the factual and procedural background in *Norton I* as follows:

> On August 21, 2006, [Norton] was indicted on armed robbery and related charges for robbing three women at Isha's Hair Salon located in Owings Mills. Evelyn Smith was a customer at the salon that day, and Mah Toure and Hassanatou Balde were employees. The evidence adduced by the State at trial showed that the robber wore a mask and was armed with a handgun. He took the women's money, purses and cellular telephones and placed the items in a black trashbag. He then duct-taped the women's hands together, ordered them to lie on the floor and left the salon.
>
> [Norton] was implicated in the robbery by his co-worker, George Bennett, who contacted the police to tell them that he had located some of the items stolen during the robbery. Bennett delivered a black bag to the police that he had recovered from a storm drain down the street from his and [Norton's] place of employment, which contained the stolen purses, cellular telephones, duct tape, and a black mask. A DNA profile created

---

[1] In addition to the confrontation argument, Norton asserts that the circuit court erred by granting the State's motion for joinder of charges. We shall not reach the joinder issue because of unusual circumstances which occurred below due to delay of the appointment of counsel. Norton argued before the circuit court that joinder was prejudicial because, *inter alia*, Norton had two attorneys -- a privately-retained attorney for the armed robbery case, and a public defender for the attempted murder case -- with different trial strategies and different witness lists. On remand, such circumstances may not present themselves if Norton is represented by a single attorney for both cases. The proceedings will be in a different posture and Norton's newly appointed counsel may again present an argument that joinder would be prejudicial.

2

from saliva taken from the black mask matched [Norton's] DNA profile. [Norton] made threatening telephone calls to Bennett for reporting him to police. A three-day jury trial on the robbery charges commenced October 9, 2007, and resulted in a hung jury.

In the meantime, on July 9, 2007, Bennett sustained serious physical injuries after he was shot in the chest while working. The unidentified shooter, using a fake name, had called Bennett prior to the shooting and falsely advised that Bennett's boss would be performing an on-site inspection that evening. The shooter then arrived at Bennett's worksite, knocked on the glass-front door and shot Bennett through the glass when he approached the door. On October 22, 2007, [Norton] was indicted on attempted murder charges for shooting Bennett.

On October 29, 2007, [Norton] was arraigned on the attempted murder charges. At that time, he was unrepresented by counsel in that case. On December 10, 2007, defense counsel from his first trial on the armed robbery charges filed a motion to strike his appearance in the robbery case.

On December 12, 2007, [Norton] was again brought before the court. Noting that defense counsel's motion to strike his appearance had not been ruled upon, the prosecutor asked the court to arraign [Norton] again and the court did so on both cases. When asked by the court if the cases were consolidated, the prosecutor stated, "We have asked for them to be joined together." On January 15, 2008, an assistant public defender entered her appearance on behalf of [Norton] in the attempted murder case.

On January 24, 2008, the State filed a motion for joinder of the offenses. It argued that the evidence in both cases was mutually admissible under its theory that [Norton] shot Bennett just before the armed robbery trial because Bennett was a key witness against him. It opined, therefore, that the armed robbery case was motive for the shooting and that the shooting was evidence of [Norton's] consciousness of guilt in the armed

3

robbery. It added that joinder was in the interest of judicial economy and that [Norton] would not be unfairly prejudiced by the joinder.

*Norton I*, *supra*, Slip Op. at 1-3.

After a hearing, the circuit court granted the State's motion for joinder and the cases were joined for trial. The State sought to introduce DNA evidence at trial through the testimony of Michael Cariola ("Cariola"), vice-president of forensic operations and technical leader at Bode Technology Group. The specific DNA evidence the State sought to introduce resulted in a match between Norton's DNA and the black ski mask recovered from a storm drain by Bennett.

Defense counsel moved *in limine* to exclude Cariola's testimony on three independent bases. First, defense counsel argued that Cariola had not been disclosed as an expert witness. Second, defense counsel argued that the State had not disclosed that Cariola would testify "on behalf of the scientist who tested Mr. Norton's DNA and compared it to the recovered evidence."[2] Third, defense counsel objected on the basis that permitting Cariola to testify would violate Norton's confrontation rights because Norton would be denied the opportunity to cross-examine Rachel Cline ("Cline")[3], the DNA analyst who actually conducted the DNA testing and prepared the report ("the Cline report"). Defense counsel also argued that

_____

[2] Norton does not raise any discovery-related issues regarding Cariola's testimony on appeal.

[3] In the briefs and transcript, Ms. Cline's last name is spelled, "Kline." On the report she prepared, her last name is spelled, "Cline." We shall use the spelling "Cline."

4

Cariola was not disclosed as an expert witness regarding the DNA testing he performed that excluded Norton's nephew Dale Gholston ("Gholston") as a possible contributor to the DNA sample taken from the mask.

The State countered that, per an agreement with defense counsel, Cariola had testified in lieu of Cline at the first robbery trial (which resulted in a hung jury), and therefore, defense counsel was aware that Cariola was the State's expert witness for the DNA evidence. The State explained that Cline had left the employment of Bode prior to the first robbery trial and that the State had provided defense counsel with all of the documents related to Cariola testifying as an expert witness. The State did not assert that Cline was unavailable, but did explain that Cline had begun new employment elsewhere. The State argued that "[i]t is entirely appropriate . . . to have an expert testify about the work of other experts."

The circuit court ruled that it would permit Cariola to testify, explaining as follows:

> It seems to me that the defense has for over a year known that [Cariola] was going to be the witness to testify as to Mr. Norton's DNA on the ski mask. In fact, [Cariola] testified to that over a year ago. Rachel Cline has never testified to that. The only witness the State has ever called to testify to that, either in the previous trial or I assume in this trial, is [Cariola] so there certainly can't be a violation of discovery when, in fact, the State is calling the same witness they called a year ago without objection. Now, as to Mr. Gholston, you're objecting to [Cariola] testifying to the testing of the DNA of Mr. Gholston. I assume that what [Cariola] is going to testify to, and please correct me if I'm wrong, is that the DNA on the ski mask is not Mr. Gholston, it's Mr. Norton.

The State answered affirmatively and advised the circuit court that Cariola would not offer any further testimony regarding Gholston.

We set forth the following in *Norton I*, *supra*:

> Immediately following the court's ruling, the forensic biologist who recovered the saliva sample from the mask, testified; the testimony spanned six transcript pages. The State then called Cariola as a witness. When the State offered Cariola as an expert in forensic DNA analysis, the court asked defense counsel if he had any questions. He responded, "No questions, your Honor. We'd just note what the discussion was."
>
> Cariola then testified as to the procedures employed at [Bode] for conducting DNA testing and the procedures performed by Cline specifically related to testing appellant's DNA against the sample from the mask. Cariola testified that [Norton's] DNA profile matched the DNA profile obtained from the mask. He then opined that [Norton] was the major source of the DNA. He also testified that Gholston was excluded as a possible contributor. The reports related to both DNA tests were admitted into evidence. While defense counsel advised that he had no objection to the admission of the report related to Gholston, he was silent when the State offered the report related to [Norton].
>
> On cross-examination, Cariola advised that he had [reviewed Cline's report], but that he was not the analyst with regard to those samples[;] the analyst was Cline. Cariola said that Cline was employed in Rockville with the armed forces DNA investigation laboratory. He stated that he reviewed all of Cline's materials and adopted her report. Cariola was, however, the analyst who conducted the DNA testing related to Gholston.

*Norton I*, *supra*, Slip Op. at 9-10.

Following a five-day jury trial, Norton was convicted of one count of attempted first-degree murder, one count of witness intimidation, one count of first-degree assault, three

6

counts of armed robbery, and four counts of use of a handgun in the commission of a crime of violence. Norton was sentenced to a term of fifty years' imprisonment for attempted murder, five years' imprisonment for witness intimidation, twenty years' imprisonment for the handgun conviction related to the attempted murder, fifteen years' imprisonment for each of the armed robbery convictions, and fifteen years' concurrent for one of the handgun convictions related to the armed robbery. All sentences were run concurrently. The remaining convictions were merged for sentencing purposes.

On appeal to this Court, Norton argued that the circuit court erred by granting the State's motion for joinder. Norton further argued that he was deprived of his right to confrontation under the Sixth Amendment of the United States Constitution because one DNA analyst was permitted to testify regarding the work of another DNA analyst. In an unreported opinion, we reversed Norton's convictions and remanded for a new trial, holding that Norton had been denied his Sixth Amendment right of confrontation. *See Norton I*, *supra*, Slip Op. at 15. We did not reach the issue of whether joinder was prejudicial "because of the unusual circumstances occasioned by the delay of the appointment of counsel in the attempted murder charges and the fact that the proceedings [on remand] will be in a different posture from that in the original trial."

Subsequently, the State filed a petition for writ of certiorari. Prior to the Court of Appeals taking action on the State's petition for writ of certiorari, *Derr I*, *supra* -- the opinion upon which our opinion in *Norton I* was based -- was vacated by the United States Supreme

7

Court and "remanded to the Court of Appeals of Maryland for further consideration in light of *Williams v. Illinois*, 567 U.S.___, 132 S. Ct. 2221, 183 L. Ed.2d 89 (2012)." *Maryland v. Derr*, 133 S. Ct. 63 (2012). The Court of Appeals subsequently issued an opinion in *Derr II*, *supra*, 434 Md. 88. Thereafter, on October 21, 2013, the Court of Appeals granted certiorari in *Norton I*, vacated our original opinion, and remanded to this Court "for further reconsideration in light of [*Derr II*], 434 Md. 88, 73 A.3d 254 (2013) and *Williams v. Illinois*, 132 S. Ct. 2221, 183 L. Ed.2d 89 (2012)."

## DISCUSSION

## I.

First, we address whether the issue regarding Cariola's testimony is preserved for our review. The State contends that this issue is not preserved for our review because defense counsel failed to make a proper contemporaneous objection to Cariola's testimony or admission of the Cline report into evidence. We reject the State's preservation argument, adopting the same analysis we set forth in *Norton I*, *supra*, in which we explained as follows:

> Rule 4-323(a) provides that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon as thereafter as the grounds for the objection become apparent. Otherwise, the objection is waived." Consequently, with some exceptions, "'when a motion *in limine* to exclude evidence is denied, the issue of the admissibility of the evidence that was the subject of the motion is not preserved for appellate review unless a contemporaneous objection is made at the time the evidence is later introduced at trial.'" *Clemons v. State*, 392 Md. 339, 361 (2006) (quoting *Klauenberg v. State*, 355 Md. 528, 539-40 (1999)). However, when a trial court had denied a motion *in limine* to exclude evidence, a contemporaneous

objection need not be made when "requiring [the defendant] to make 'yet another objection only a short time after the court's ruling to admit the evidence would be to exalt form over substance.'" *Id.* at 362 (quoting *Watson v. State*, 311 Md. 370, 372 n.1 (1988)).

Here, defense counsel moved *in limine* to exclude Cariola as an expert witness just prior to the very succinct testimony of the forensic biologist. Cariola was called as the State's next witness. When the State offered Cariola as an expert witness, defense counsel advised that, although he did not have *voir dire* questions, "We'd just note what the discussion was." Clearly, in so stating, defense counsel was objecting to Cariola's testimony on the grounds raised moments before during the motion *in limine*. "In light of the close temporal proximity between the trial court's ruling on the motion *in limine* and [Cariola's[ testimony, we will resolve the ambiguity in favor of [Norton] and consider the issue p[re]served for review." *See Washington v. State*, 191 Md. App. 48, 90, *cert. denied*, 415 Md. 43 (2010). In addition, with regard to [Norton's] failure to object when the DNA report was offered into evidence, given the extensive conversation of the issue that occurred during the motion *in limine*, and the court's clear ruling denying the motion just moments before, "a subsequent objection would [have been] futile." *See In re Emileigh F.*, 353 Md. 30, 38 (1999).

*Norton I*, *supra*, Slip Op. at 10-12. Accordingly, we conclude that the issue is preserved for our review and we shall turn to the merits of Norton's argument.

**II.**

A criminal defendant in a Maryland court possesses a right of confrontation both under the Sixth Amendment to the United States Constitution[4] and under Article 21 of the

---

[4] The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . [and] to examine the witnesses against him on oath[.]" U.S. Const. amend. VI. "The Sixth

9

Maryland Declaration of Rights.[5]  The confrontation rights under Article 21 and the Sixth

Amendment have, in past cases, been analyzed "*in pari materia*, or as generally providing

the same protection."  *Cooper*, *supra*, 434 Md. at 232.

A brief discussion of Confrontation Clause jurisprudence is helpful to provide a

framework and a context for our analysis.  Prior to the United State Supreme Court's opinion

in *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court "took the

view that the Confrontation Clause did not bar the admission of an out-of-court statement

that fell within a firmly rooted exception to the hearsay rule."  *Williams*, *supra*, 567 U.S.___,

132 S. Ct. at 2232 (citing *Ohio v. Roberts*, 448 U.S. 56 (1980) ).  In *Crawford*, however, the

United States Supreme Court held that "[t]estimonial statements of witnesses absent from

trial [can be] admitted only where the declarant is unavailable, and only where the defendant

has had a prior opportunity to cross-examine."  *Id.* (quoting *Crawford*, *supra*, 541 U.S. at 59).

"Since it was decided in 2004, [Maryland courts have] followed the [*Crawford*] framework

. . . to analyze whether the Confrontation Clause has been violated."  *Cooper*, *supra*, 434 Md.

at 233.  "Under *Crawford*, and its progeny, the right of confrontation is implicated only when

two conditions are met: the challenged out-of-court statement or evidence must be presented

Amendment right to confront witnesses is binding on Maryland through the Fourteenth
Amendment."  *Cooper v. State*, 434 Md. 209, 233 n. 11 (2013) (citing *Cox v. State*, 421 Md.
630, 642 (2011)).

[5] Article 21 of the Maryland Declaration of Rights provides, in relevant part, that "[i]n
all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses
against him . . . [and] to examine the witnesses for and against him on oath[.]"

for its truth and the challenged out-of-court statement or evidence must be 'testimonial.'"

*Id.* (citing *Derr II*, *supra*, 424 Md. at 106-07; *Cox*, *supra*, 421 Md. at 643; *Michigan v. Bryant*, 562 U.S. ___, 131 S. Ct. 1143 (2011); *Crawford*, 541 U.S. at 59-60 n.9.).

Following its opinion in *Crawford*, the United States Supreme Court addressed the issue of scientific reports in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. at ___, 131 S. Ct. 2705 (2011). In *Melendez-Diaz*, the Supreme Court addressed whether "certificates of analysis" from a state forensic laboratory, which indicated that a particular substance was found to contain cocaine, were testimonial. 557 U.S. at 309-11. The Supreme Court held that the admission of the certificates, which were executed under oath before a notary, violated the Confrontation Clause. *Id.* at 311.

In *Bullcoming*, *supra*, the Supreme Court similarly held that a report certifying that a sample of the defendant's blood had an alcohol concentration of 0.21 grams per hundred millimeters was testimonial. 564 U.S. at ___, 131 S. Ct. at 2723. Rather than calling the analyst who performed the testing, the prosecution had called a different analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the defendant's] blood sample." *Id.* at 2709. The Supreme Court held that the "surrogate testimony . . . does not meet the constitutional requirement," explaining that "[t]he accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.* at 2710.

Not all forensic test results, however, have been held by the Supreme Court to be testimonial. In *Williams*, *supra*, 567 U.S. \_\_\_, 132 S. Ct. 2221, the Supreme Court addressed whether the results of a DNA test conducted by a private laboratory were testimonial. There was no majority opinion in *Williams*, but both the plurality opinion and Justice Thomas's opinion, concurring in the judgment, "agreed that the introduction at trial of the challenged forensic test result did not violate the Confrontation Clause because the result was not 'testimonial.'" *Cooper*, *supra*, 434 Md. at 234 (citing *Williams*, *supra*, 567 U.S. \_\_\_, 132 S. Ct. 2221).

Inasmuch as there was no majority opinion in *Williams*, it is not immediately clear precisely what standard to apply when determining whether forensic test results are testimonial. In *Derr II*, *supra*, the Court of Appeals examined *Williams* at length and determined the appropriate standard for our Confrontation Clause analysis. 434 Md. at 114-17. Because there was no majority opinion in *Williams*, the Court of Appeals looked to the position taken by the Justices who "concurred in the judgments on the narrowest grounds," explaining as follows:

> As noted above, there is no majority opinion of the Court in *Williams*. In general, when interpreting the holding of a United States Supreme Court decision where there is no opinion that commands the support of the majority of the Justices, courts have applied the standard articulated by the Supreme Court in *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993, 51 L. Ed.2d 260, 266 (1977) (quotation omitted): "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by

12

> those Members who concurred in the judgments on the narrowest grounds." *See Wilkerson v. State*, 420 Md. 573, 594, 24 A.3d 703, 715 (2011); *Grutter v. Bollinger*, 539 U.S. 306, 325, 123 S. Ct. 2325, 2337, 156 L. Ed.2d 304, 330 (2003); *United States v. Rivera–Martinez*, 665 F.3d 344, 347 (1st Cir. 2011). In this case, requiring that statements be, at a minimum, formalized to be testimonial is the "position" taken by the five Justices who agreed that the Confrontation Clause was not violated "on the narrowest grounds."

*Derr II*, *supra*, 434 Md. at 114. The Court of Appeals noted that the *Williams* "plurality did not clarify how to determine if a statement is sufficiently formalized to be testimonial." *Id.* at 116. The Court continued:

> Both the plurality opinion and Justice Thomas's concurring opinion, however, use nearly the same examples of what constitutes sufficiently formalized statements, namely affidavits, depositions, prior testimony, or statements made in formalized dialogue or a confession. *See* 567 U.S. at ––––, 132 S. Ct. at 2242, 183 L. Ed.2d at 114 (plurality); 567 U.S. at ––––, 132 S. Ct. at 2260, 183 L. Ed.2d at 133 (Thomas, J., concurring in judgment). We, thus, conclude that courts should rely on Justice Thomas's concurrence to determine whether a statement is formalized.

*Id.*

In his concurrence in *Williams*, *supra*, Justice Thomas explained that the forensic report at issue was not testimonial because it "lack[ed] the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact." 567 U.S. at ___, 132 S. Ct. at 2260 (Thomas, J., concurring in judgment). Justice Thomas continued:

> Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. The report is signed by two "reviewers," but they neither purport

13

to have performed the DNA testing nor certify the accuracy of those who did. And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation.

*Id.* (citation omitted). Justice Thomas emphasized that, unlike the reports at issue in *Melendez-Diaz* and *Bullcoming*, the challenged report in *Williams* "in substance, certifies nothing."[6] *Id.* Our Court of Appeals has applied the standard set forth by Justice Thomas in two cases: *Derr II*, *supra*, 434 Md. 88, and *Cooper*, *supra*, 434 Md. 209. This Court applied the standard in one case: *Malaska v. State*, 216 Md. App. 492 (2014).

In *Derr II*, *supra*, the Court of Appeals held that the serological exam results and DNA test results in that case were not sufficiently formalized to be testimonial. 434 Md. at 118-120. Regarding the serological exam results, the Court observed that there were "no signed statements or any other indication that the results or the procedures used to reach those results were affirmed by any analyst, examiner, supervisor, or other party participating in its development." *Id.* at 119. The Court further emphasized that, "[l]ike the Cellmark report at issue in *Williams*, the serological examiner's notes 'lack the solemnity of an affidavit or deposition, for [they are] neither a sworn nor a certified declaration of fact[,]'

---

[6] Justice Thomas noted that the reports at issue in *Melendez-Diaz* "were sworn to before a notary public by [the] analysts who tested [the] substance for cocaine" and that the report at issue in *Bullcoming*, "though unsworn, included a 'Certificate of Analyst' signed by the forensic analyst who tested the defendant's blood sample." *Williams*, *supra*, 567 U.S. at ___, 132 S. Ct. at 2260. Justice Thomas noted that the analyst "affirmed that . . . the statements in [the report] are correct," and that the analyst had "followed the procedures set out on the reverse of th[e] report." *Id.*

14

nothing on the notes 'attest[s] that [their] statements accurately reflect the . . . testing processes used or the results obtained[,]' there is no signed statement from a person who did the test or someone 'certify[ing] the accuracy of those who did' and, although the serological examination was performed at the request of law enforcement,' the results are 'not the product of any sort of formalized dialogue resembling custodial interrogation.'" *Id.* (quoting *Williams*, *supra*, 567 U.S. at \_\_\_, 132 S. Ct. at 2260) (Thomas, J., concurring in the judgment).

The Court similarly concluded that the DNA test results at issue in *Derr II* lacked the solemnity to be testimonial under *Williams* because "[n]o statements . . . appear anywhere on the results attesting to their accuracy or that the analysts who prepared them followed any prescribed procedures." *Id.* One set of DNA results admitted as evidence "display[ed] a series of numbers and lines, and on the bottom of the documents [were] the initials of two parties." *Id.* Other results were identical but contained no initials on the bottom of the documents. *Id.* at 120. The Court of Appeals concluded that, "although there are initials on the bottom of [one set of] DNA test results, there [were] no statements providing any certifications." *Id.* Accordingly, the Court of Appeals held that "the DNA test results [were] not sufficiently formalized to meet the requirements set out in *Williams*." *Id.*

The Court of Appeals reached a similar conclusion in *Cooper*, *supra*, when it determined that a DNA report was not sufficiently formalized to be testimonial. 434 Md. at 236. The Court described the report at issue in *Cooper* as follows:

15

> The report . . . is a two page document indicating, among other things, when the report was created, what items were tested, what procedures were used to develop the results, and the DNA results developed from the testing. Nowhere on either page of the report, however, is there an indication that the results are sworn to or certified or that any person attests to the accuracy of the results. Although [the report was developed] at the request of the Baltimore City Police Department, [the report] is not the result of any formalized police interrogation.

*Cooper*, *supra*, 434 Md. at 236. The Court of Appeals "appl[ied] Justice Thomas's reasoning" and "conclude[d] that the . . . report lack[ed] the formality to be testimonial." *Id.*

We reached a contrary result on the issue of whether a report was testimonial in *Malaska*, *supra*, 216 Md. App. at 511. In *Malaska*, we concluded that an autopsy report was sufficiently formalized to be "testimonial" for purposes of the Confrontation Clause. *Id.*[7] We observed that the autopsy report at issue contained the signatures of Dr. Boggs, Dr. Weedn, and Dr. Fowler. Dr. Boggs and Dr. Weedn personally participated in the autopsy, and Dr. Fowler is the Chief Medical Examiner for the State of Maryland. *Id.* at 509-10. We explained that "[a]lthough the report does not employ the words 'attest' or 'certify' or any variation thereof, the signatures clearly imply that the signatories agree with and approve the contents of the report." *Id*. at 510. We further noted that several Maryland statutory

---

[7] In *Malaska*, although we concluded the report was testimonial, we held that the Confrontation Clause was not violated when a supervisor who was present at the scene and participated in an autopsy testified, rather than the assistant who physically performed the dissection. *Id.* at 516-517.

provisions require specific formalities regarding the performance of autopsies and associated written reports. *Id*.

Turning to the evidence at issue in the instant case, we note that the Cline report is a three-page document. The first page lists identification numbers and descriptions for two pieces of evidence, which are described as "buccal swab[8] from suspect Harold Norton" and "cutting from ski mask (+amylase phadebas dark blue)." A paragraph at the bottom on the first page provides that "[t]he DNA profiles reported in this case were determined by procedures that have been validated according to standards established by the Scientific Working Group on DNA Analysis Methods (SWGDAM) and adopted as Federal Standards."

On page two, the Cline report sets forth its conclusions as follows:

> **CONCLUSIONS AND STATISTICS:**
>
> 1.      The DNA profile that was obtained from evidence item 2S06-062-02 is a mixture that includes a major component male DNA profile. The major component male DNA profile matches the DNA profile obtained from the reference item from Harold Norton (2S06-062-01).
>
> The probability of randomly selecting an unrelated individual with this DNA profile is:
>
> > 1 in 900 Quintillion (1 in $9.0 \times 10^{20}$) from the Caucasian population;
> > 1 in 1.5 Quintillion (1 in $1.5 \times 10^{18}$) from the African American population;

---

[8] A "buccal swab" is a DNA sample "obtained by swabbing the cheek area inside of a person's mouth." *Derr II*, *supra*, 434 Md. at 99.

17

> 1 in 18 Quintillion (1 in 1.8 X $10^{19}$) from the SW
> Hispanic population;
> 1 in 27 Quintillion (1 in 2.7 X $10^{19}$) from the SE
> Hispanic population.
>
> **Therefore, within a reasonable degree of scientific certainty, Harold Norton (2S06-062-01) is the major source of the biological material obtained from evidence item 2S06-062-02.**
>
> The evidence and extracts will be returned to the Baltimore County Police Department.
>
> Report submitted by:
>
> [Signature]                             [Signature]
>
> Rachel E. Cline                       Susan Bach, MFS
> DNA Analyst III                      Forensic Casework Manager

(Emphasis added.) On page three, a table sets forth a "Summary of Short Tandem Repeat Results" comparing the reference sample from Norton and the cutting from the ski mask.

Viewing the Cline report as a whole, we conclude that it is sufficiently formalized to render it testimonial. Unlike the reports at issue in *Derr II* and *Cooper*, the Cline report included language guaranteeing, "within a reasonable degree of scientific certainty," that Norton "is the major source of the biological material obtained from" the ski mask. Moreover, the report's conclusions are located directly above the signatures of Rachel E. Cline and Susan Bach. The inclusion of such formalities in the report make it significantly different from that at issue in *Williams*, *supra*, which Justice Thomas emphasized did not "attest that its statements accurately reflect the DNA testing processes used or the results

18

obtained." 567 U.S. at ___, 132 S. Ct. at 2260. Further, the report at issue in *Williams* did not "certify the accuracy of those who [performed the DNA testing]." *Id*. Unlike the report in *Williams*, which "in substance, certifie[d] nothing," *see id.*, the Cline report explicitly provided that the results were accurate "within a reasonable degree of scientific certainty."

As we explained in *Malaska*, *supra*, the use of specific language -- such as "attest" or "certify" -- is not required for a report to be considered formalized; certain "signatures clearly imply that the signatories agree with and approve the contents of the report." 216 Md. App. at 510. A reading of the Cline report clearly reflects that it was intended to be an authoritative, accurate document, prepared in conformity with specific federal standards and based upon specific, validated procedures. Accordingly, we hold that the Cline report is sufficiently formalized to be "testimonial" for purposes of the Confrontation Clause.

We further hold that the circuit court erred by permitting Cariola's testimony regarding the Cline report, and by admitting the Cline report through the testimony of Cariola. Cariola acknowledged that he did not perform any analysis of Norton's DNA sample but merely reviewed the Cline report and associated lab notes and data after the analysis was performed. Such surrogate testimony is plainly insufficient under *Bullcoming*, *supra*, 131 S. Ct. at 2710 ("[S]urrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist."), and *Melendez-Diaz*, *supra*,

19

557 U.S. at 319 ("Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well.").

Under the circumstances of this case, it was improper for the circuit court to receive Cariola's surrogate testimony and admit Cline's report merely because Cariola was Cline's supervisor. Accordingly, we shall reverse the judgment of the circuit court and remand the case for further proceedings.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY BALTIMORE COUNTY.**